## MILLER et al., Appellants, v. SLUPSKY et al.

**Division One, December 11, 1900.**

1. **Witness:** SEPARATE PROPERTY OF DECEASED WIFE: HUSBAND AS WITNESS.  In a suit brought by the heirs of a deceased married woman against her husband, to divest him of title to real estate conveyed to him by a third party, on the ground that the purchase price of said lot was paid with the separate money and property of his said deceased wife, he is not a competent witness to show that the land was bought and·paid for with his own money.  She was "the other party" to the cause of action, which such heirs in her stead after her death are asserting.

2. ———: ———: ———: IN. EQUITY CASE.  As such suit, however, is one in equity, such incompetent evidence may, on appeal, be disregarded.

3. **Separate Estate of Wife:** DEED TO HUSBAND.  Where the conviction is irresistibly forced upon the mind of this court that the deceased wife of defendant at the time of her marriage to him, was possessed of a large sum of money, which was as between them her separate statutory estate, and that .out of that money or its proceeds the purchase price for the house and lot in suit was paid, the deed to which was made to him, this court will reverse a judgment in his behalf, and decree title in her heirs.

Appeal from St. Louis City Circuit Court.—*Hon. H. D. Wood*, Judge.

REVERSED AND REMANDED (*with directions*).

*Thomas B. Harvey* and *T. J. Rowe* for appellants.

(1) The court erred in permitting defendant, Abraham Slupsky, to testify. When one party to the contract is dead the other party is incompetent. R. S. 1899, sec. 4652; Meier v. Thieman, 90 Mo. 433; Chapman v. Dougherty, 87 Mo. 617; Ring v. Jamison, 66 Mo. 424; Wood v. Mathews, 73 Mo. 477; Stanton v. Ryan, 41 Mo. 514. (2) A trust is raised in favor of one who pays the consideration for land, although the deed is made to another. Price v. Kaine, 112 Mo. 412; Darrier v. Darrier, 58 Mo. 227; Hall v. Hall, 107 Mo. 101; Miller v. Davis, 50 Mo. 572; Kelly v. Johnson, 28 Mo. 249; Baumgartner v. Goessfield, 38 Mo. 36; Plumb v. Cooper, 121 Mo. 675. A husband investing wife's personal property in land holds the title in trust for her. Jones v. Elkins, 143 Mo. 647; Alkire v. Ballenger, 137 Mo. 369; Seay v. Hesse, 123 Mo. 450; Owings v. Wiggins, 133 Mo. 630. (3) There is no evidence to sustain the finding and decree of the court.

*Chester H. Krum* for respondents.

The issue determined below was one of fact, and was determined against the appellants because the story told by their witnesses and themselves was incredible and beyond the possibilities of human belief. (1) While the cause is equitable and this court will examine the evidence, yet the court will defer to the finding of the chancellor, by whom the cause

was determined. Cox v. Cox, 91 Mo. 71. (2) This is especially the rule where the issue was determined on oral testimony. Benne v. Schnecko, 100 Mo. 250; Lins v. Lenhardt, 127 Mo. 271. (3) The finding will be thus deferred to, unless the trial court manifestly disregarded the evidence. Snell v. Harrison, 83 Mo. 652, or where (4) the finding is manifestly against the preponderance of credible testimony. Short v. Taylor, 137 Mo. 517.

BRACE, P. J.—On the 16th of January, 1895, Sophia Slupsky, wife of the defendant Abraham Slupsky, died intestate, without lineal descendants, leaving surviving her, *the plaintiffs*, her mother, *Esther Miller*, her sister *Sarah Wasser*, her half brother, *Julius Miller*, her sister, *Lea Silverstein*, her half sister, *Eva Berger*, and *the defendant* her sister, *Florida Slupsky*, her only heirs at law. Prior thereto, on the 27th of March, 1894, by warranty deed of that date, duly recorded, Morris Micheal, executor of the estate of Lucy Drucker, in consideration of the sum of $4,500, conveyed to the said defendant Abraham Slupsky lot 21, block 9, of Peter Lindell's first addition to the city of St. Louis, having a front on the north line of Laclede avenue of twenty-five feet, on which is house No. 3319.

Afterwards on the 14th of December, 1897, the plaintiffs instituted this suit, by which they seek to divest the said defendant Abraham Slupsky of the title thus acquired, and to have the same vested in the heirs at law aforesaid of the said Sophia Slupsky, on the ground, as alleged in the petition, "that the purchase price of said lot, to-wit, the sum of $4,500, was paid with the separate money and property of the said Sophia Slupsky." The answer to the petition was a general denial. On the hearing the plaintiffs' bill was dismissed, and judgment rendered against them for costs, from which they appeal.

(1)  On the trial the defendant Abraham Slupsky was permitted to testify, over the objection and exception of the plaintiffs to his competency, *in substance,* that the lot was bought and paid for by him with his own money.  This was error.  The plaintiffs' cause of action is derivative.  They as heirs were asserting a cause of action which Sophia Slupsky is alleged to have had against Abraham Slupsky in her lifetime, she being the one party to that cause of action and he the other, and she being dead he was incompetent to testify in the action.  [R. S. 1889, sec. 8918; Lins v. Lenhardt, 127 Mo. 271; Messimer v. McCray, 113 Mo. 382; Meier v. Thieman, 90 Mo. 433.]  As was said in the last case cited: "The language of the statute is 'the other party,' i. e., the other original party to the contract or cause of action, shall not be admitted to testify in his own favor, when death has precluded the other *original party* from an equal opportunity.  Whether party to the record or not, makes no difference as to the statutory incompetency of the witness; he is prohibited from testifying in his own favor in any case whatsoever when the other original party to the contract or cause of action in issue and on trial is dead."  This being an equity case, however, the evidence of this incompetent witness might be disregarded, and a reversal for the error of its admission avoided, if, as is contended by counsel for respondent, "the story told" by the other witnesses is "incredible and beyond the possibilities of human belief."  The facts of the story disclosed by evidence as to which there seems to be no dispute, are about as follows:

Mrs. Sophia Slupsky was thrice married.  Her first husband was one Morris Levy, who died about the year 1877.  He was at the time a member in good standing in a lodge of "The Free Sons of Israel," and after his death she was paid the sum of $1,000 by the lodge.  Afterwards she married a

man by the name of Herman Michael, a jeweler by trade. When or where this marriage took place does not appear, but it does appear that after their marriage they resided, and Michael carried on business, first at New Madrid, Mo., afterwards at Jonesboro, Arkansas. The business seems to have been carried on in New Madrid in the name of "S. Michael & Company" or "Sophia Michael & Company," and resulted there in an apparent failure and an assignment to Jacob Slupsky, the husband of Sophia's sister Florida. After which they went to Jonesboro, when the business seems to have been carried on by Michael in his own name for some seven or eight years before his death; and where on the 18th of March, 1891, he died intestate, childless, and without any known heirs so far as the evidence discloses. No administration was had upon his estate, and soon thereafter the widow disposed of all the property at Jonesboro, whether held in her own name or that of her husband, and came to St. Louis, to reside, bringing the proceeds thereof with her. Michael at the time of his death was a member of the "United Masonic Benefit Association," and within ninety days of his death she received at St. Louis from that association, the further sum of $1,000. On the 7th of October, 1891, she married the defendant Abraham Slupsky. She was then about thirty-five years of age and Abraham Slupsky was about thirty-one. So far as the evidence discloses, he then had no property or money.

On November 13, 1891, they rented a safe deposit box of the St. Louis Safe Deposit Company to which each had a key, and they continued to hold that box until the year 1895.

Four or five months after the marriage, Abraham went into business with the Jacob Slupsky hereinbefore mentioned. The business was conducted at LaCrosse, Wisconsin. He put $1,500 into the business, and drew out $2,000 afterwards.

On the 4th of March, 1894, he entered into a written contract for the purchase of the premises in controversy at the price of $4,500, three thousand dollars to be paid in cash, the remainder in monthly payments of fifty dollars each. In pursuance of this contract the cash payment was made with moneys taken from the safe deposit box aforesaid, and for the remainder Abraham Slupsky executed his promissory notes, securing the payment of the same by a deed of trust on the premises. Thereupon the deed in question, of the 27th of March, 1894, was executed and delivered to Abraham Slupsky, and thereafter on the 11th of August, 1895, all his notes for the deferred payments were paid and the deed of trust released on the 5th day of September, 1896.

In the following extracts from the evidence of the witnesses as it appears in appellants' abstract, will be found the additional facts from which the story as a whole is to be rounded out:

*Esther Miller*, plaintiff, testified: That Sophia Slupsky was married to Herman Michael, who died at Jonesboro, Arkansas, before her marriage to Abraham Slupsky. Herman Michael was engaged in the jewelry business at Jonesboro, Arkansas. He had a regular stock of jewelry, watches, silverware and diamonds. After the death of her husband she sold a part of the jewelry and brought a part of it to St. Louis. She got, after her husband's death, $2,000. She brought with her to St. Louis about $4,500. I put it in my bosom. She had $2,000 left her by her husband. Besides she got $1,000 insurance from one lodge, $75 from another lodge, and $25 from another. My daughter had $4,500 when she came to St. Louis from Jonesboro. This was before her marriage to Abraham Slupsky. My daughter came to St. Louis three or four months after the death of her husband, Herman Michael, then she went back to Jonesboro, Arkansas,

and sold out everything; then she returned to St. Louis three or four months afterwards, and married Abraham Slupsky. It was seven months after her first husband died that she married Abraham Slupsky. My daughter Sophia at the time of her death was living in a house on Laclede avenue that she bought; I don't know the number of the house. She had been living in the house seven or eight months before her death. She and Abraham Slupsky, the defendant, lived on Laclede avenue about seven months before her death. · I had kept her money before her marriage to Abraham Slupsky. After she married Slupsky we counted the money and put it in the safe deposit. I went down to the safe deposit with her; there was $4,500 in the package that was placed in the safe deposit. I can go to the building where the money was deposited; I don't know the name of the street. I was with her when she took the money out to buy the house. Abraham Slupsky took me and my daughter with him to look at the house on Laclede avenue when he was about to purchase the same. Abraham Slupsky said, "Mother, look at that; I think it is first-class; this is the money Sophia gave him to buy the house." My daughter took the money out of the safe deposit company to buy the house. My daughter said she liked the house on Laclede avenue and that the money would be safe if she bought the house. This was the house on Laclede avenue. She never got any part of the $4,500 that was used to purchase the house from Abraham Slupsky. My daughter, Mrs. Abraham Slupsky, never had any children.

On cross-examination, she testified: The $4,500 that was placed in the safe deposit company was counted by Mrs. Silverstein at her house. I helped count the money. It was in $20, $50, $10 and $5 bills. I was living on Carr street the time the money was placed in the safe deposit; the same money was counted again on Olive street, where Mrs.

Slupsky lived.   Sophia Michael had a house in Jonesboro after her husband's death which she sold when she sold the jewelry from her husband's store.   She had $2,000 in cash; she got $1,000 from the lodge, and sold the house in Jonesboro and sold the jewelry; the house in Jonesboro sold for $600.

*Lea Silverstein*, plaintiff, testified, that the defendant, Abraham Slupsky, was married to my sister, Sophia Slupsky. The marriage occurred on the 7th day of October, 1891.   Mrs. Slupsky's name, at the time of her marriage to Abraham, was Sophia Michael.   The marriage took place in the city of St. Louis.   Sophia had been a widow about eight months before she had married Abraham Slupsky.   Her first husband, Michael, resided at Jonesboro, Arkansas.   After the death of her husband, Michael, she came to St. Louis, remained about eight days and then returned to Jonesboro and settled up his affairs.   She stayed there about four months.   She had lived there about seven or eight years.   Her husband, Michael, died March 18, 1891.   My sister, Sophia, died January 16, 1895. I remember about the purchase of the house on Laclede avenue; that was about eight months before the death of my sister.   She was living at 2742 Olive street at the time.   The number of the house on Laclede avenue is 3319.   At the time of the purchase of the house, my sister had $4,500. Shortly after my sister came up from Jonesboro, she accumulated all her money; she sold a lot of jewelry at Jonesboro, besides Michael left $2,000 in his safe after his death.   Then $1,000 she got from the lodge, $75 from another lodge, and $25 from another.   Besides that, she sold the fixtures, store, clocks, jewelry, musical instruments and silverware.   A part of those things she sold at Jonesboro, and a part she brought here with her.   She accumulated $4,500, which she gave to her mother, and her mother kept it for her.   She had accumu-

lated all this money before she married Abraham Slupsky. The house on Laclede avenue was bought about eight months before the death of my sister, Mrs. Abraham Slupsky. The defendant, Abraham Slupsky, said, "Well, I am satisfied that you people can not complain against what I have done. I took Sophia's money and put it to good use. She always longed for a good home; I took the money and got her a good home, and she has nothing to complain about now." Before the house on Laclede avenue was purchased I went with Slupsky and his wife to see the house. He said he was going to take Sophia's money and buy the house. My sister, Sophia, got the money from the safe deposit company to buy the house. My sister, Sophia, was married three times; the first time to Mr. Levy. She received $1,075 from the lodge that Mr. Levy belonged to. Then she married Michael and then she married Slupsky. She had no children. Mr. Michael left no will and there was no administration of the estate. Mrs. Michael took the property and the money.

*Sarah Wasser*, plaintiff, testified, that "in the spring of 1891, after the death of Mr. Michael, my sister brought plenty of money, plenty of jewelry, plenty of watches and plenty of diamonds from Jonesboro. I heard Abraham Slupsky say after they were all fixed up at 3319 Laclede avenue, 'Now you see I have bought a nice house for Sophia's money. She has no kick coming.' He asked me how I liked the house and I told him it was very nice. I heard him make that statement about a month or two after they moved into the house. I saw Mrs. Silverstein, my mother, and Sophia Slupsky, my sister, at 913 Morgan street, count the money. This was before her marriage to Abe Slupsky. Abraham Slupsky showed me the house and told me that he took Sophia's money to buy her a nice comfortable home. He said that to me once or twice, I don't remember exactly.

I heard him say to her, "You can not say I have never bought you a house with your money. I make no use of your money, only to buy you a nice home, for yourself with your own money."

*Julius Miller*, plaintiff, testified, as follows: I lived with Abraham Slupsky and my sister at the house 3319 Laclede avenue before her death. To the best of my judgment I lived there about eight months before her death. I heard Abraham Slupsky say to his wife, when she complained about his being out late at night, "Have you not got all you want; I put your money to good use; I purchased you a home here." He said to me frequently, "Your sister has a nice home; her money was put to good use." Michael had a half interest in a hotel at Jonesboro. After his death I went with Mrs. Michael to Jonesboro to assist her in running the hotel. We ran it for about three months. The safe that was in the jewelry store was removed to the hotel. I was in Jonesboro when part of the fixtures of the jewelry store were sold. She got about $400 or $500 for some of the things that were sold at Jonesboro. I counted what Mrs. Slupsky had when she came to St. Louis after Michael died. I counted it in the hotel at Jonesboro. There was $2,300 or $2,400 at the time. It was in the safe. Michael was buried in St. Louis. Eight or nine days thereafter I returned with his widow to Jonesboro. I don't remember whether my mother was at Jonesboro at the time of the funeral or at St. Louis. I removed the safe; a large case in which they kept silverware and fine clocks to the hotel. The rest of the stock was kept in trays in the safe. It was a pretty large safe. The jewelry stock, safe and fixtures, I should judge, was worth about $3,000, not counting Mrs. Michael's individual jewelry. She sold most of the cheap stuff after the safe was taken to the hotel, upon which was realized $500 or $600.

*Hannah Wasser* testified for plaintiff as follows:   I am the daughter of Sarah Wasser.   Esther Miller is my grandmother,   Sophia Slupsky, deceased, is my aunt; her name was Michael when she married Abraham Slupsky.   I visited the house, 3319 Laclede avenue, frequently, and I lived there with my aunt.   I heard Abraham Slupsky say to her that she had no kick coming, for he had purchased her a home, which was what she wanted such a long time.   She has got it now; he was not spending her money.   It was her money that bought the home; what he was spending now was his own. I heard Abraham Slupsky time and again, I don't remember how often, say to my aunt it was her money purchased the home.

*Florida Slupsky,* wife of Jacob Slupsky, testified *for defendants,* as follows:   My sister Sophia Slupsky, after the death of her husband Michael, received $1,000 from the lodge, which was insurance on the life of her husband, Michael. She had a house at Jonesboro.   She sold that house for $600 to a brother-in-law of mine who lives at Jonesboro, whose name is Morris Berger.   He is the husband of my half sister Eva Berger.   I know she had jewelry.   I know my husband made an auction sale for her at Jonesboro; I don't know what was realized from that sale.   My sister told me my husband made a good auctioneer.   My husband and his brother, Abraham Slupsky, went into business after my sister's marriage to Abraham; the business was conducted at LaCrosse, Wisconsin, . . . . . . . That was about four or five months to the best of my knowledge after their marriage.   My sister was thirty-nine years of age at the time of her death.   Abraham Slupsky was about thirty-five years of age at the time of my sister's death.   My sister's first husband's name was Levy. He died about twenty-one years ago.   Then she married Michael.   At the time of the death of Levy, my sister Sophia

received $1,000. I saw that my sister had a good deal of jewelry. I didn't know that she had a good deal of money outside of the jewelry. I knew she had $1,000 from the lodge, the house at Jonesboro and some jewelry, consisting of watches, rings and chains. I knew she had personal diamonds; there was a pair of ear rings, a breast pin, a couple of rings, a watch set with diamonds; that was all the diamonds that I know of. I had heard that the jewelry was not brought to St. Louis but was sold at Jonesboro. . . . . . . . Michael failed in business at New Madrid, and Michael went through New Madrid to Jonesboro to go into business there. I don't know how long he was in business at Jonesboro. I don't know how much Michael made by his failure at New Madrid. He turned over everything to my husband, Jake. Jake sold it out; disposed of it. No person got any part of the proceeds of the sale except Jake. I don't know how much he made by the deal at New Madrid. He had a good business at New Madrid, and was making a nice living there.

"Q. They were doing right nicely; the only reason you could see for the assignment was that he wanted to make more money out of it then and leave. A. I suppose."

While the additional abstract of the respondent brings out some inconsistent statements of some of the witnesses, they are insignificant, and the complexion of the story is not materially changed thereby, and after a careful consideration of all the evidence disputed and undisputed, and all the facts and circumstances of the case, the conviction is irresistably forced upon our minds, that the deceased Sophia at the time of her marriage with Abraham Slupsky was possessed of a large sum of money which was, as between them, her separate statutory estate. That this money was deposited in the safety box before mentioned, and that out of that money or its proceeds, the purchase price of the premises was paid, the deed

for which Abraham Slupsky took in his own name. The judgment of the circuit court will therefore be reversed and the cause remanded with directions to that court to enter a decree divesting the said defendant Abraham Slupsky of the legal title by him acquired as aforesaid to said real estate, and vesting same in the heirs at law aforesaid of the said Sophia Slupsky. All concur.