PAULINA F. E. LARUE, MATHIAS LARUE, PETER LARUE and PAULINA LARUE, by ALBERT H. MILLER, Her Guardian, Appellants, v. ELIZABETH LARUE. — 294 S. W. 723.

### Division One, May 24, 1927.

1. **PLEADING: Fraudulent Conveyance: To Defraud Heirs and Wife; Cause of Action.** He who conveys property to his unlawful wife to conceal his ownership and for the purpose of defrauding his children of their inheritance, and his real wife of her dower and homestead, cannot recover it, and his children cannot recover it after his death; and a petition, to establish an implied or resulting trust, brought by his children and said real wife, which alleges that he "took title to said real estate in the name of defendant for the purpose of concealing his ownership thereof, and of defrauding and depriving them of their respective rights as his widow and heirs," does not state a cause of action on behalf of the children.

2. ———: ———: **To Defraud Wife: Cause of Action.** Decedent's wife, neither knowing nor participating in his fraudulent acts, may maintain an equitable action for the recovery of dower and homestead in real estate conveyed by him to another for the purpose of depriving her of her marital rights therein.

3. **RESULTING TRUST: Proof.** The evidence to establish an implied trust, whether technically resulting or constructive, must be so cogent, clear, unequivocal and positive as to banish doubt from the mind of the chancellor.

4. ———: ———: **Ability to Buy.** In a suit by the real wife to establish an implied trust and to recover dower and homestead in real estate conveyed to her deceased husband's unlawful wife, evidence indicating that he had the money with which he might have bought and paid for the property, but none showing that he did, is not sufficient.

---

Corpus Juris-Cyc. References: **Descent and Distribution,** 18 C. J., Section 111, p. 862, n. 94; Section 113, p. 864, n. 9. **Dower,** 19 C. J., Section 287, p. 555, n. 45; Section 288, p. 556, n. 50; Section 289, p. 556, n. 51. **Equity,** 21 C. J., Section 177, p. 191, n. 79. **Pleading,** 31 Cyc., p. 729, n. 54. **Trusts,** 39 Cyc., p. 160, n. 62; p. 166, n. 89.

Appeal from Circuit Court of City of St. Louis.—*Hon. A. B. Frey,* Judge.

AFFIRMED.

*Robert Walker* and *William Hilkerbaumer,* for appellants.

(1) When a cause in equity comes to this court on appeal, it is for hearing *de novo* and will be considered as if it had originated here and was to be heard for the first time. The appellate court will sift the whole evidence and determine what the finding of the trial court should have been, and is the judge of both fact and law. Lins v. Lenhardt, 127 Mo. 280; Turner v. Overall, 172 Mo. 287; Price v. Morrison, 291 Mo. 266. (2) A resulting trust is created where property is paid for with the money or assets of one person and the title thereto is taken in the name of another person, and the controlling question is the ownership of the purchase money. Shaw v. Shaw, 86 Mo. 598; Condit v. Maxwell, 142 Mo. 274; Morris v. Clare, 132 Mo. 232; 39 Cyc. 118. (3) No claim is made that George LaRue made provision for defendant, if he bought and took title in her name. If such presumption can under any circumstance be indulged, it is a rebuttable one, and it is rebutted by the facts and circumstances in evidence. Thiery v. Thiery, 298 Mo. 25, 249 S. W. 946; Gillespie v. Gillespie, 289 S. W. 579. (4) LaRue not only did not make provision for his lawful wife, but took title in the name of another to prevent her rights from attaching. (5) The rule that the evidence must be clear, unequivocal, and convincing is satisfied in this case. Miller v. Slupsky, 158 Mo. 643; Crawford v. Jones, 163 Mo. 577. (6) A resulting trust may be established by the person who furnishes the purchase price, or after his death by his heirs. 39 Cyc. 525; Crawford v. Jones, 163 Mo. 577; Young v. Thrasher, 115 Mo. 227. (7) The widow, is entitled to dower and homestead rights in the property in suit. Young v. Thrasher, 115 Mo. 227; Davis v. Evans, 102 Mo. 164; Davis v. Green, 102 Mo. 170; Reeves v. Peterman, 109 Ala. 366, 19 So. 512; Edmonson v. Meacham, 50 Miss. 34; Stubendorf v. Hoffman, 23 Neb. 360, 36 N. W. 581.

*John R. Davis* for respondent.

(1) Evidence to establish a resulting trust must be clear, strong, cogent and unequivocal, and so definite and positive as to leave no room for doubt. Viers v. Viers, 75 S. W. 395; Wavrin v. Wavrin, 220 S. W. 931; Woerheide v. Kelley, 243 S. W. 158; Bartlett v. White, 272 S. W. 944; Gillespie v. Gillespie, 289 S. W. 579; Shaw v. Shaw, 86 Mo. 598. (2) Where the husband purchases property with his own means, but causes a conveyance to be made to his wife, it is presumed that he intended the transfer to be a gift to his wife, and while the presumption is rebuttable, it can be overcome only by clear and positive evidence leaving no doubt in the mind of the chan-

cellor. Bender v. Bender, 220 S. W. 929; Stevens v. Stevens, 273 S. W. 1066; Dyer v. Dyer, 2 Cox, 92; Alexander v. Warram, 17 Mo. 228.

ELLISON, C.—This is a suit in equity to establish an implied or resulting trust, filed December 29, 1922. By the decree of the trial court the plaintiffs' bill was dismissed and the title to the real estate in controversy—a dwelling house and parcel of ground in St. Louis, hereinafter called the Bates Street property—was quieted in the defendant. The plaintiffs have appealed on the sole ground that under the evidence the decree should have been for them. They are the heirs of George LaRue, who died July 29, 1922, and his widow by a second marriage, Paulina LaRue—impleaded by and through her guardian, she being a person of unsound mind. The defendant-respondent is the reputed third wife of the deceased.

A review of the record and a consideration of the whole case on its merits have convinced us that the cause was rightly decided by the learned chancellor who tried it. In accordance with the statutory mandate we set out a statement of the facts and legal conclusions which induce us to that view.

The petition conventionally recites that LaRue purchased and paid for the real estate involved and took title in the name of the defendant; that he died thus owning the land, and occupying it as a homestead; that the plaintiff widow, in consequence, is entitled to dower and homestead and, subject thereto, the plaintiff heirs to specified undivided fractional interests in the fee. The prayer is for divestiture of title out of the defendant into the plaintiffs according to their respective interests, for a determination of the interests of all the parties, for possession and costs, and for general relief. As characterizing the intention of the deceased LaRue it is alleged ''that said George LaRue took title to said real estate in the name of defendant for the purpose of concealing his ownership thereof, and of defrauding and depriving these plaintiffs of their respective rights as widow and heirs of the said George LaRue.''

The defendant's answer is a general denial and a plea of the ten-year Statute of Limitations, Section 1305, Revised Statutes 1919, coupled with an affirmation that she bought the real estate in controversy and paid the consideration out of her own separate means. As forecast by the pleadings, and as recognized in the briefs of counsel, the ultimate issue of fact is as to the ownership of the purchase money passing in the transaction.

The undisputed evidence is that George LaRue was twice married. By his first wife, Catherine, who died in August, 1881, he had one child, Frederick, who left at his death in 1899 two sons, the appellants Mathias and Peter. Four months after the demise of his first

317 Mo. Sup.—14.

wife, or in December, 1881, George married the appellant Paulina LaRue, who bore him a year later a daughter, the appellant Paulina F. E. LaRue, also known as Lena, and hereinafter so designated. In 1883 when the latter was about a year old, the former became afflicted with some form of melancholia, and, whether for that reason or because driven away, as one of plaintiffs' witnesses surmised, a neighbor woman took both mother and daughter from LaRue's home to her own, and shortly thereafter the father of Paulina carried her and her infant daughter back to his home in Montgomery County. Thence, Paulina was presently transferred to an insane asylum in St. Louis, where she since has remained. Lena has continued to live in the home of her maternal grandfather.

In preparation for her confinement Paulina employed as domestic servant and attendant the respondent, Elizabeth LaRue, who then was a girl about seventeen years old, one of six children of humble parentage, their father being a common laborer living in a rented house. Elizabeth continued in her employment as a servant in the LaRue home from before the birth of Lena in 1882 until the departure of Paulina and Lena in 1883, and thereafter until 1885 performed additional work as an assistant in the office from which the deceased LaRue conducted a retail coal business. The uncontradicted testimony of Elizabeth (though doubted by appellants, in their brief) is that during this two-year period George LaRue made several trips to Pennyslvania, where he had relatives, the longest for about two weeks.

In February, 1885, George proposed marriage to Elizabeth, exhibiting a paper purporting to be an authenticated copy of a decree of the Supreme Court of Huntington County, Pennsylvania, dated February 24, 1885, granting to him, as plaintiff, a divorce from the appellant Paulina LaRue. Elizabeth testified she read over the decree and believed it genuine, and for that reason never submitted it to a lawyer. He also showed her a copy of a newspaper called the Springfield Weekly Journal, Volume 1, No. 48, dated Springfield, Mo., Thursday, February 19, 1895, containing an advertisement on the fourth page notifying the defendant in a suit between George LaRue and Paulina LaRue "to be at Mapleton, Huntington County, and State of Pennsylvania, on Tuesday, the 24th day of February, 1885," and failing, judgment would be rendered against *him*. Elizabeth preserved this paper because, she said, "it was to my interest." Objection was made by counsel for appellants to the introduction of these documents unless respondent would concede both the divorce decree and notice were null and void. This being agreed, they were admitted in evidence, "to show defendant's good faith in entering marriage with George LaRue." Appellants' inference is that the two papers were procured in the perpetration of a scheme, on the

part of both George and Elizabeth, to fortify against a possible prosecution for bigamy following a contemplated bogus marriage.

A ceremony of marriage between George and Elizabeth was performed at St. Louis on April 21, 1885. They lived together before the world as man and wife for thirty-seven years until his death in 1922 at the age of nearly eighty-five years, she bearing him four children (not parties to the record) who, with her, constituted his family and wore his name. She was a party to seven of the deeds introduced in evidence by appellants to show the real estate transactions hereinafter mentioned, and in all of them her surname was given as "LaRue;" in four of them, wherein she joined as grantor with George LaRue, she was described as his wife; and, finally, when this suit was instituted by the appellants she was sued as Elizabeth "LaRue."

On the main issue, to establish their case the appellants attempted to trace into the purchase price of the Bates Street property proceeds from the sale of other pieces of real estate theretofore owned by George LaRue. In fact the appellants' whole showing consisted of a narrative by their three witnesses of the LaRue family history prior to 1895, plus the deeds evidencing the real estate transfers just referred to, plus certain alleged admissions, inconsistencies and improbabilities in the testimony of the respondent, Elizabeth LaRue.

It appears that at and prior to the time of the void marriage between George and Elizabeth, the former and his son, Frederick, owned two adjoining lots in St. Louis designated by street number as 7911 and 7913 Pennsylvania Avenue, respectively. Their title was derived from Catherine LaRue, deceased, mother of Frederick and first wife of George. George, it seems, had, or claimed the fee title to the lot at No. 7913, which was vacant, and a life estate in the lot at No. 7911, with the fee in Frederick. There was a small frame cottage on the latter lot in which the LaRue family lived. It was to this home that Elizabeth went when she entered the household as a servant, and here she lived as a member of the family after her supposed marriage, for about ten years until 1895. In that year Frederick married, whereupon George executed a quit-claim deed of both lots to Frederick for a consideration of one dollar. Elizabeth did not join in this deed and George was described as "husband of Catherine LaRue, who died intestate in the city of St. Louis about August, 1881." On the same day Frederick quit-claimed the vacant lot at 7913 Pennsylvania Avenue to Elizabeth for a like consideration of one dollar.

Forthwith, a house was built on the vacant lot, into which George and Elizabeth moved, possession of the old house being surrendered to Frederick. Elizabeth testified that this new dwelling house was built with her own money. There is nothing in the record specifically

to the contrary, but the appellants dispute her, claiming Elizabeth had no separate means—but of this, more presently. At all events, George and Elizabeth lived in the new home at 7913 Pennsylvania Avenue for about ten years until they sold the property.

In the meantime, in February, 1900, George LaRue foreclosed a mortgage securing a loan he held against a lot on Michigan Avenue in St. Louis, and bid in the property at the foreclosure sale. He and Elizabeth deeded the lot for an expressed consideration of $2,000 in October of the same year to Fred W. Hoertel, who, about three weeks later, conveyed the same to Elizabeth for a like consideration.

At the time of George's frustrate marriage to Elizabeth in 1885 and from then until 1903, he owned, also, a lot at 300 Schirmer Street in St. Louis, which was used for his retail coal business and coal yard. This, it will be remembered, made three pieces of real estate owned by him and Elizabeth, viz.: the property at 7913 Pennsylvania Avenue, the Michigan Avenue property, and the Schirmer Street property, the title to the former two being held by Elizabeth, and the title to the latter being in George.

In 1903 George's health failed and forced his retirement from business. In December of that year he sold his coal business and the Schirmer Street coal yard for $2500, and for the remaining nineteen years of his life continued an invalid and unemployed, living with Elizabeth and their children. About eighteen months later, in July, 1905, Elizabeth and George sold the Pennsylvania Avenue property, where they had been living for the preceding ten years, for $2500. Thence they moved to the Michigan Avenue property and there resided about a year, but on June 25, 1906, they sold that place for $2500.

Two days later, on June 27, 1906, Elizabeth purchased the Bates Street property, in controversy now, for a consideration of $1118.75. The tract was unimproved, and for about five months the LaRue family lived in rented quarters until a house was erected thereon, into which they moved. It was George LaRue's home when he died in 1922, and the home of Elizabeth and her children at the time of the trial below. Elizabeth's story is that she personally paid in currency and coin the consideration money and received from the grantor the deed, exchanged in the purchase of the property. In this she is uncontradicted by any direct testimony, and is explicitly corroborated by two of her children, who assert they were eye witnesses to the transaction. All of them say George LaRue took no part in it, though he was in the house, sick in bed in another room. Elizabeth says, further, that the money was her own, as was the money used in building the house. The appellants insist that though she may have disbursed the funds, they *belonged* to George and not to her.

On this, the crucial issue in the case, Elizabeth testified that in 1884, when she was eighteen years old, she had an uncle named Christian Spring, her father's sister's husband, who gave her $6,000 in paper money. The money was for services rendered by her father, and was paid to her by Spring at her father's direction or suggestion after Spring had first offered the money to the father and the latter had refused to accept it. No gift was made by Spring at the time to her mother, sister or four brothers. Afterward Spring went to Germany and traveled and then returned to St. Louis, where he died. The year of his death she did not remember, except that it was some time before she moved away from the Pennsylvania Avenue neigh-borhood in 1905. When he died he left her second brother a house and some money. He never made gifts to any members of her father's family other than herself and this brother. This $6,000 Elizabeth kept in the house or on her person. It was never banked. From it she built the house at 7913 Pennsylvania Avenue. The remainder she continued to save in the same way until it was used in buying the Bates Street property and building the house there, except that after George became an invalid in 1904 she supplemented therefrom the earnings of her four children in defraying the family living expenses.

Elizabeth made no claim to ownership of the proceeds from the three properties sold by her and George between 1903 and 1906. The $2500 received from the Schirmer Street property was George's—the title was in him. The $2500 from the Pennsylvania Avenue property was his, apparently, and the $2500 from the Michigan Avenue property was his, though the title to both these tracts stood in her name; indeed, she disclaimed any recollection that the latter land had been conveyed to her. But she stated that George lost his money through an unfortunate investment prior to her purchase of the Bates Street property in June, 1906. He put, she says, more than $5,000 in corporate stock of the Tennant Shoe Company, which failed and went into bankruptcy within three months, as a result of which he lost it all.

There are some discrepancies in Elizabeth's story of this venture. On direct examination she stated that George bought the Shoe Company stock shortly after the sale of the Schirmer Street property (in December, 1903), and that the only money he then had was the $2500 from the sale of that property and—if we understand her testimony—the $2500 derived from the sale of the Pennsylvania Avenue property in July, 1905. On cross-examination she fixed the time of the investment as 1906 while they lived in the Michigan Avenue property, and said the $5,000 used came from the sales of this same Michigan Avenue property and the Schirmer Street property. Ap-

pellants stress the point that as only two days elapsed between the sale of the Michigan Avenue property and the purchase of the Bates Street property, the whole financial excursion could not have been made and ended in disaster within that brief interval—and so they brand her entire story as false.

I. The foregoing fairly and fully reviews the evidence. Before determining the weight and effect of it, consideration should be given to the issue tendered by the appellants' bill. Clearly, so far as concerns the appellant heirs, the petition fails to state a good cause of action. This defect is jurisdictional in nature, and self-asserting. [Chandler v. C. & A. Railroad Co., 251 Mo. 592, 599, 158 S. W. 35; State ex rel. Kelly v. Trimble, 297 Mo. 104, 124, 247 S. W. 187.] The pleading charges a wrongful intent on the part of George LaRue to conceal his ownership of the Bates Street property for the purpose of defrauding his heirs of their inheritance, and his wife, Paulina, of her dower and homestead. If George LaRue were living and prosecuting the suit equity would not extricate him from a situation in which he had become involved by his own fraud. [Derry v. Fielder, 216 Mo. 176, 193, 115 S. W. 412; Keener v. Williams, 307 Mo. 682, 707, 271 S. W. 489.] His descendants had no vested interest in his property before his death, and, by the same token, will not be permitted, as heirs, to plead the turpitude of their ancestor in asserting the same fancied cause of action, claimed by succession. [Sell v. West, 125 Mo. 621, 628, 28 S. W. 969, 49 Am. St. Rep. 508; Rowley v. Rowley, 197 S. W. 152, 155.]

*Right of Heirs.*

II. In respect of the appellant widow, Paulina, the case stands on a different footing. She was not a party to the alleged fraudulent conveyance and there is neither pleading nor proof that she participated therein or had knowledge thereof. On the contrary, under the facts *alleged* she was an innocent and injured party and entitled to relief. [1 Perry on Trusts and Trustees (6. Ed.) p. 355, sec. 212; McGehee v. Garringer, 224 S. W. 828, 830.] From an early day in this State courts of equity have assumed jurisdiction in cases of equitable cognizance for the recovery of dower (Davis v. Davis, 5 Mo. 183, 187; Devorse v. Snider, 60 Mo. 235, 239; Donaldson v. Donaldson, 249 Mo. 228, 235, 236, 245, 155 S. W. 791; Weller v. Collier, 199 S. W. 974, 975); and for its assignment (Young v. Thrasher, 115 Mo. 222, 227, 234, 21 S. W. 1104; Newton v. Newton, 162 Mo. 173, 181, 185, 61 S. W. 881). There is authority elsewhere that such jurisdiction extends even to legal estates, and is exercised concurrently with courts of law. [2

*Right of Wife.*

Story, Equity Jurisprudence (14 Ed.) sec. 844; 19 C. J. 555, secs. 287, 289.] Equity also reaches the homestead. [Harrington v. Utterback, 57 Mo. 519; Hach v. Rollins, 158 Mo. 182, 189, 59 S. W. 232; Growney v. O'Donnell, 272 Mo. 167, 179, 186, 198 S. W. 863.]

III.   When, however, we scrutinize the proof supporting the petition, we find ourselves unable to say it measures up to the standard required in cases of this character.  As declared in a recent expression of this court on the subject, and many preceding **Character of Proof.** cases, the evidence to establish a resulting trust must be so cogent, clear, unequivocal and positive as to banish doubt from the mind of the chancellor. [Hodes v. Hodges, 292 S. W. 12, 15.]  Everywhere, an extraordinary degree of proof is exacted in the establishment of implied trusts; and whether the trust conceived in this case be, technically, resulting or constructive (Ferguson v. Robinson, 258 Mo. 113, 129, 167 S. W. 447), the doctrine is the same. [Lefkowitz v. Silver, 23 A. L. R. 1491, 1500, Annotation.]

IV.   This case is one in which considerable deference to the findings of the chancellor might be allowed, since the issue turns largely on the oral testimony of the respondent, Elizabeth LaRue, **Insufficient Proof.** whose character is assailed    (Wavrin v. Wavrin, 220 S. W. 931, 932); but from the record we have no difficulty in reaching an independent conclusion entirely in accord with that of the trial court.  The appellant's evidence, indulging all reasonable inferences, does little more than indicate George LaRue had money which might or could have been used in the purchase of the Bates Street property, for there is no showing that it was so used; and we are not disposed to discredit the testimony of Elizabeth LaRue to the contrary.  [Moore on Facts, p. 220, sec. 173, p. 1198, sec. 1060.]  The element of proof missing here was present in Miller v. Slupsky, 158 Mo. 643, 59 S. W. 990, and Crawford v. Jones, 163 Mo. 577, 63 S. W. 838, relied upon by appellants, and the evidence was much stronger in other respects.

Holding these views, the decree *nisi* should be affirmed. *Lindsay* and *Seddon, CC.,* concur.

PER CURIAM:—The foregoing opinion by ELLISON, C., is adopted as the opinion of the court.  All of the judges concur.