ADA ADAMS v. MELVIN ADAMS, Appellant, DELLA ADAMS, ROY ADAMS, MAY FOWLER, PEARL COOK, CLARENCE ADAMS, GEORGE ADAMS, BERTHA ADAMS, ELLA ADAMS, HOLLIE ADAMS, OPAL ADAMS, and LAURA JANE ADAMS, Defendants.—156 S. W. (2d) 610.

Division Two, October 25, 1941.

Rehearing Denied, December 16, 1941.

*A. M. Spradling* for appellant.

*J. Grant Frye* and *Gerald B. Rowan* for respondent.

1044.

ELLISON, J.—This is a partition suit instituted by respondent in 1937, in which the only appealing defendant, Melvin Adams, filed a separate answer and cross bill claiming title to the real estate involved through a resulting trust; also alternatively asking credit for taxes paid thereon over a period of about twenty-five years. The other adult defendants answered admitting the truth of his cross bill and the minor defendants filed a general denial. The Chancellor found for respondent; rendered an interlocutory decree in partition ordering a sale of the land and a division of the proceeds among the parties according to their interests as found; and dismissed appellant's cross bill except that he was allowed credit in the sum of $161.75 for taxes paid on the land.

The real estate is Lots 1 to 10; both inclusive, Block 1, Hardy and Keeley's Addition to the village of Edna (now Fornfelt) in Scott County. The common source of title is Amanda E. Adams, mother of the appellant and the four other defendants first named in the

caption. She died intestate in November, 1935. The remaining seven defendants were her grandchildren, all by her son James, who predeceased her. The plaintiff-respondent Ada Adams is the widow of another son, Holly, who died intestate and without issue after the death of his father and mother. All this made the real estate divisible into seven child's shares. Respondent elected under Sec. 329, R. S. 1939, sec. 329, Mo. Stat. Ann., p. 216 to take one-half of the share of her deceased husband Holly and thus comes by her one-fourteenth interest asserted here. The remaining fourteenth went to the appellant and the other defendants, Holly's five surviving brothers and sisters and the children of his deceased brother James, under the second clause of Sec. 306, R. S. 1939, sec. 306, Mo. Stat. Ann., p. 194.

In brief, appellant asserts he paid the purchase price of the real estate, which was bought in two parcels in 1912 and 1914 and used as a family home; that he improved it and paid the taxes thereon; but the title was taken in the father's name. Later domestic trouble developed between the father and mother and the former deeded the property to the latter with knowledge on her part of the facts. She died holding the record title. Respondent claims the title passed by descent from the mother. Appellant maintains the facts raise a resulting trust with the equitable title in him; but that if his proof on that issue be insufficient he at least is entitled to credit for the taxes he paid on the land from the time it was bought.

Prior to 1909 the Adams family had lived in Illinois. In his late 'teens the appellant came to southeast Missouri and got a job on a railroad. He testified he told his mother "when they lost their home in Illinois if she would come to Missouri, I had a job working on the railroad, and I would maintain a home for her, and I done it." The parents moved to Fornfelt and lived with him in rented houses until, as appellant testified, "we got this place and built a home of our own." Lots 3 to 10, aforesaid, were purchased in June, 1912, the deed being made to the father. Appellant then lacked about four months of being twenty-one years old. He said he paid $100 cash on the purchase price. The father and mother gave three notes for the balance, one for $150 and two for $200, due respectively one, two and three years after date, secured by their deed of trust on six of the lots. Appellant declared he later paid all the notes with interest, and thereby completed the payment of the whole purchase price.

When the notes were paid they were not cancelled, but appellant had them assigned to himself without recourse. The first two were paid practically when due. The third note was assigned to appellant in June, 1914, a year before it was due, but it bears interest credits thereafter for 1915, 1916 and 1917. Lots 1 and 2 were purchased in January, 1914, over a year after appellant had reached his majority, but that deed also was made to the father. The purchase price was a $130 unsecured note due two years after date, signed by the parents.

Appellant testified he also paid that note. The face of the note was marked "paid in full." Interest payments are credited on the back for five years clear up to 1919.

The same year the first eight lots were purchased, according to appellant's testimony, the father wasn't doing anything and built a house thereon with the assistance of a man named Kelly. Appellant bought the lumber. Some years later he had a new roof put on which cost $177.50. He and his brother Holly had a porch built on the north side, both paying for it. The father also had some work done and paid for part of the lumber. His sister Della paid for papering the house once. The mother and father both lived in the house until they separated in 1921. He left, and died in 1930. The mother continued to live there until her death in 1935. Appellant lived there until his marriage in 1931. The brother Holly lived there until he died in 1937. Two sisters, Della and May, also lived there, the latter until she married. When Holly died and his estate was appraised in probate, his interest in the lots was valued at $200. Appellant was present and didn't then claim the property was his own; but he testified he asserted it didn't belong to Holly, and that he had paid about $750 on it and the taxes.

Emil Stech, county collector for twelve years after 1922, said as he remembered the appellant paid the taxes on the property every year during that time. Tax receipts were introduced covering eighteen years between 1917 and 1940 with five years missing, 1918, 1922, 1927, 1928 and 1935. These receipts show city taxes paid in only three years, 1937, and 1938 and 1940. The aggregate of all such payments was $526.91. Of these $396.09 was paid before the mother's death in November, 1935, and $130.82 afterward, as we figure it. The latter payments are covered by Exs. 12, 12a and up to Ex. 17 inclusive. Two of the whole number of receipted statements were issued to the mother and four to the father, but appellant said he paid all these taxes. On direct examination he testified he paid the 1937 taxes, Ex. 15, for $25.52; on cross-examination he said he thought his brother Holly did. If this was true it reduced the amount paid by appellant after the mother's death to $105.30. In addition to the foregoing appellant's brother Roy testified the parents told him on his frequent visits from Illinois that appellant paid the taxes. Testimony to the same effect was given by three of his sisters, two nephews and three neighbors or acquaintances of the parents.

Regarding appellant's paying for the property, the brother Roy testified the parents said not once but several times that he did, and named the amount. He also testified the parents said appellant paid for the material that went into the house, and the father and another man built it with some help from appellant when he was not out on the railroad. Appellant's sisters Della Adams and May Fowler and a nephew George Adams, testified appellant invited the parents to

move from Illinois to Missouri and promised to buy them a home. Mrs. Pearl Cook, another sister, said appellant paid for building the house. Several neighbors and friends quoted the mother as acknowledging her gratitude to appellant for his filial kindnesses. But some of this testimony was equivocal. We shall review it more closely later on.

Respondent testified in her own behalf that she didn't know of appellant's claim of title until after the property was appraised, following the death of her husband Holly Adams. She said appellant was present ▮ at the appraisal of Holly's estate and made no claim to an interest in the land but did state he had paid some taxes thereon and had some work done around there, and he wanted to know how he could get his money back. He seemed to understand that the share of each child would be one-seventh. The appraisers, Messrs. Castleman and Arnold, corroborated this testimony and said the whole value of the property was fixed at $1400 and the interest of the deceased son Holly Adams appraised at $200. Respondent also stated her deceased husband, Holly, paid the taxes on the property twice, had walks "built around there," had the garden plowed, paid the utility bills sometimes, bought groceries for the whole family and arranged to have the house papered.

Appellant says the chancellor ruled the case below on the mistaken legal theory that when a child furnishes the purchase price of land and the title is taken in the name of a parent, a presumption arises that the money was a gift to the parent. This, says appellant, is wholly erroneous, the presumption being to the contrary that a resulting trust arose. There is nothing in the record showing the chancellor entertained the view ascribed to him by appellant; but we freely concede the first part of appellant's thesis is correct, namely that money so advanced is not presumed to be a gift, the status of the child being the same as that of a stranger, at least where no legal obligation rests on the child to support the parent. [2 Bogert on Trusts, sec. 460, p. 1404; 65 C. J., secs. 154, 177, pp. 381, 416.] There is no such legal obligation in this State, except insofar as it may be implied in the special circumstances of our Social Security Law. [Subsection 1, Sec. 9396; Subsection 2, Sec. 9397; Subsection 6, Sec. 9406; Subsection 2, Sec. 9407; all R. S. 1939, Mo. Stat. Ann., sec. 12967-b, p. 7478.]

But we can approve only with qualifications, or explanation, the second part of the thesis, that in the circumstances stated a resulting trust is *presumed*. It is true that when one person furnishes the purchase price of land and another takes the title, the law *implies* a resulting trust in favor of the former. As the term signifies, the trust *results* from those facts; and in that sense it may be said the law presumes or supposes an intent to create a trust after the basic facts are proven. [65 C. J., sec. 155, p. 380.] But until then no such

presumption arises. For the law also requires contracts for the sale of real estate and conveyances of title to be in writing; and prima facie presumes the holder of the title to be the owner. [65 C. J., sec. 80, p. 318.] Further in the public interest, recording acts have been in effect in this country generally since early in its history providing for the recording of such instruments. And so, because of the instability of parol evidence and for the repose of titles, almost universally the cestui que trust is required to show by clear, cogent and convincing evidence the underlying facts necessary to raise the presumption. [65 C. J., sec. 85, p. 324, sec. 195, p. 435, sec. 204, p. 440; 26 R. C. L., sec. 44, p. 1203, sec. 77, p. 1231; 23 A. L. R., p. 1500 (Annotation citing among many others 82 Missouri cases up to 1923).]

██ To substantiate his claim in this case it therefore devolved on appellant to adduce evidence of high probative value reflecting these essentials: (1) the showing must be consistent with an intent to create a trust for his own benefit, 65 C. J., sec. 141, p. 336, differing in that respect from the rule applicable to constructive trusts, 65 C. J., sec. 14, p. 225; Suhre v. Busch, 343 Mo. 679, 694(1), 123 S. W. (2d) 8, 15(1); (2) the presumed or supposed intent must have existed at the time the father acquired title to the real estate in 1912 and 1914, 65 C. J., sec. 161, p. 394; Clubine v. Frazer, 346 Mo. 1, 9(7), 139 S. W. (2d) 529, 532(12); (3) the money advanced by appellant at the time and subsequently must have been paid with that purpose, and not as a loan or gift to the parents, 65 C. J., sec. 166, p. 401; (4) if the money was loaned no resulting trust can arise even though it was understood the parents' title should be held for the benefit of appellant as security for the money advanced by him, or even on an agreement to share in the profits, 65 C. J., sec. 167, p. 402; Maupin v. Longacre, 315 Mo. 872, 880(1), 288 S. W. 54, 57 (1); Purvis v. Hardin, 343 Mo. 652, 657, 122 S. W. (2d) 936, 939. We have reviewed these propositions because they are fundamental; and more particularly because they are referred to in only one of the decisions cited by appellant.

In a number of appellant's cases a son provided the purchase money and the parent took the title to land under a family arrangement resembling the one in this case, and in each instance it was held a resulting trust arose. But in all of them the evidence showed a reason why the child failed to take the title in his own name. Thus, he was a minor and could not execute a valid obligation for deferred payments in Crowley v. Crowley, 72 N. H. 241, 56 Atl. 190; Johnson v. Anderson, 66 Tenn. 251; and Grayson v. Bowlin, 70 Ark. 145, 66 S. W. 658. In Cowles v. Cowles, 89 Neb. 327, 131 N. W. 738, there was an outstanding judgment against the son; in Gerace v. Gerace, 301 Mass. 14, 16 N. E. (2d) 6, he was in bankruptcy. In other cases there was a definite understanding between the parent and child that the land should belong to the latter, as in Martin v. Thomas, 74 Ore. 206, 144 Pac. 684, and Rickes v. Rickes, 81 Ind. App. 533, 141 N. E. 486.

In O'Neill v. O'Neill, 227 Pa. 334, 76 Atl. 26, the father had stated both before and after the purchase that the money belonged to the son and he was the one to be suited; and yet nevertheless the father had the deed made out to himself and recorded without the son's knowledge.

Clark v. Clark, 191 Ark. 461, 86 S. W. (2d) 937, was a suit by a son against his parents to establish a resulting trust. They wanted to buy a farm but did not have the money. The son agreed to "help pay for it" and did to the extent of $2200 in various remittances, and the parents paid the remaining $800. The decision affirmed a decree vesting a 22/30 interest in the title in the son because: (1) the mother kept careful account of his remittances, which she would not have done if they had been gifts; (2) proceeds from the farm were applied by the parents on the purchase of other real estate for the son; (3) and possession of the farm was surrendered to the son twice when he returned to Arkansas, and he retained the proceeds. The opinion does not consider whether the money advanced by the son might have been a loan to the parents, and otherwise the facts are unlike those in the instant case.

In the third preceding paragraph we said appellant had cited only one case referring to the weight of parol evidence necessary to establish a resulting trust. That decision is Townsend v. Chaillett (Tex. Civ. App.), 45 S. W. (2d) 354, 357 (4). There the sole child and heir of the deceased first wife of C sued his widow and the children of his second marriage to establish a constructive trust in land. The first wife had loaned $1000 of her separate money to S, and after her death S deeded the land to C in satisfaction of the debt. A jury returned special findings of fact to that effect, but the trial court rendered judgment for defendants *non obstante veredicto*. The Appellate Court reversed that judgment.

The opinion referred to the defendants' contention that evidence to establish a resulting trust must be clear and satisfactory; but held the rule did not apply because the object of the action was not to establish a resulting trust, but a constructive trust independent of the intention of the parties. It further declared if the rule did apply it had been satisfactorily met, because in Texas the trial court does not pass on the weight and credibility of the testimony even in equity cases to establish such trusts, but merely determines whether there is clear and satisfactory evidence *tending* to establish the constructive trust—in other words, evidence sufficient to make an issue for the jury. All we need say in answer to this is that in Missouri such equity cases are never tried to a jury except in rare instances where an advisory verdict is desired; and that the chancellor weighs the evidence. [Northrip v. Burge, 255 Mo. 641, 667, 161 S. W. 584, 590(9).] Furthermore, it is the rule in this State and generally elsewhere, that a high degree of oral proof is required to establish both constructive

and resulting trusts. [Suhre v. Busch, supra, 343 Mo. 1. c. 700(4), 123 S. W. (2d) 1. c. 19(6) ; 23 A. L. R., p. 1500, Annotation.]

The facts of the instant case force us to the conclusion that the Chancellor was right in refusing to decree a resulting trust in favor of appellant. The evidence was not of the clear and convincing character required by our law. It is true appellant was a minor, by a few months, when he paid $100 on the purchase price of the eight lots originally bought and the deed was made to the father. But he had attained his majority when the remaining two lots were purchased and yet that deed also was made to the father. Nowhere in the briefs or record is there a suggestion that the lots were deeded to the father because the appellant was incapacitated by minority or would be embarrassed by taking the title. He was not residing in another state, as in the Clark case from Arkansas, but lived at home with the family until his marriage in 1931; and while he advanced by far the greater part of the money expended in buying the lots, building ▉▉▉▉ and improving the house, and paying taxes, yet his father performed labor and paid for part of the lumber. His brother Holly shared the cost of having a porch built, and his sister Della once had the house papered.

Furthermore, only $100 of the $650 purchase price of the eight lots was paid by the appellant when the title was acquired, and the parents alone gave the three notes for the remaining $550. It is not disputed that appellant paid off these notes subsequently, but there is no evidence of any understanding at the time they were given that appellant should pay them, which would have been necessary to create a trust, under the authorities heretofore cited. The same is true of the unsecured $130 note given in payment for the two lots bought in 1914. Again, if appellant regarded the three notes for the $550 as his own obligations, why did he have them *assigned* to him when he paid them instead of having them marked paid; and why does the last of them bear interest credits for three years after it had been assigned to him in June, 1914? In addition to all that the query arises as to why appellant failed to assert exclusive title to the lots until he filed his cross bill in this case, twenty-five years after eight of them were purchased in 1912 and twenty-three years after the other two were bought in 1914, with these events intervening: the deeding of the lots by the father to the mother in 1921; his death in 1930; her death in 1935; and Holly's death in July, 1937, followed by a probate appraisal of a one-seventh interest in the lots as a part of his estate.

Beyond all that much of the testimony of appellant's witnesses is equivocal on the question whether the money he used in buying the lots and paying purchase money notes was advanced as *his own* with the intent that the lots should belong to him, or was advanced as a loan or gift to the parents. His brother Roy testified the parents

said several times appellant had bought the lots, and then added that the mother told him "dad couldn't pay it and Melvin paid it out." This indicates the father intended to pay for the lots but could not, and appellant came to his rescue. Mrs. Cook, a sister, testified appellant told the parents in Illinois to move to Missouri and "he would get them a house." Being next asked if appellant bought some property, she answered (italics hereafter ours), "*Well no*, that house he built." The mother was quoted by Ed Scherer as saying appellant "*helped* pay on the place;" by Frazier Ray, that "*he helped me out* paying for my home;" by Mrs. Scherer, that "she didn't know what she would do if it hadn't been for Melvin," and that "he *kept up the place* and taxes;" by Mrs. Ben Speaks, that "she always said without Melvin the house couldn't keep going because *he paid all the expenses,* and without him there wouldn't be any home;" and by Holly Adams, appellant's nephew, that "she didn't know what she would have done if it hadn't been for Uncle Melvin *building the home* and keeping it going for them."

Now regarding the payment of the taxes on the lots. According to appellant he paid the aggregate sum of $526.91. He said he paid other taxes but there was no proof of the amount. If, as he opined on cross-examination, his brother Holly paid the 1937 taxes, the total would be reduced to $501.39, of which $105.30 was paid after the mother's death in November, 1935. The Chancellor allowed him a credit on this latter account for $161.75, evidently on the theory that the fee simple title was in the mother and he did not become a tenant in common until her death. On this appeal he contends he should be credited with the full amount if the resulting trust issue be decided against him, as the Chancellor did and we do on this appeal.

From the time the lots were purchased in 1912 and 1914, the title was first in the father, and after he deeded the lots to the mother in 1921 it was in her until she died in 1935. During that period of twenty-one to twenty-three years appellant had no title in the lots (the resulting trust issue being eliminated). *Nemo est haeres viventis.* As a mere heir expectant he had no vested interest in them. [Wass v. Hammontree (Mo. Div. 1), 77 S. W. (2d) 1006, 1010(6); LaRue v. LaRue, 317 Mo. 207, 214(1), 294 S. W. 723, 726(3).] He could not have sued the other heirs for contribution of their proportionate shares of the taxes paid. But in this partition suit with the resulting trust issue eliminated the rule is different: first, in that he is required to establish the fact of paying the taxes and the intent with which he did it, only by the greater weight of the evidence and not by the high degree of proof exacted on the discarded branch of the case; and second, if he believed in good faith he was the real owner of the lots when he paid the taxes, and by so doing he preserved the property for his co-tenants, he is entitled on moral and equitable grounds to have those disbursements taken into account.

There is nothing unique in requiring a litigant to establish one branch of his case or defense by clear, cogent and convincing evidence under the rule of law applicable thereto, and in holding him only to proof by the greater weight of the evidence on another branch, in conformity with a different rule applying in the latter instance. It was done in Ambruster v. Ambruster, 326 Mo. 51, 67, 74, 31 S. W. (2d) 28, 34(1), 38(13), 77 A. L. R. 782, 793, 798; and in circumstances almost identical with those here, in Walker v. Eller, 178 Ark. 183, 189, 10 S. W. (2d) 14, 17.

With respect to appellant's right to an accounting for *all* taxes paid by him. We find no cases directly in point, though there are numerous decisions on analagous claims for improvements placed on the common property. Some hold these can be allowed only when the improvements were constructed during the *existence* of a co-tenancy. [47 C. J., sec. 498, p. 470.] But there are numerous decisions ruling a tenant in common may have an accounting in partition for improvements made by him under a bona fide but mistaken belief that he was the sole owner of the property. [47 C. J., sec. 499, p. 470; 3 Pomeroy's Eq. Juris. (4 Ed.), sec. 1241, p. 2978.] We think the weight of evidence in the instant case indicates the appellant *thought* he owned the lots, though he did not have the legal title. It is true he did not claim them exclusively as his own when a one-seventh interest in them was appraised as a part of the estate of his deceased brother Holly; but he testified he did say Holly did not own them and that he had paid about $750 on them and the taxes. It is undisputed that he paid the whole consideration for the eight lots first purchased, by making the initial payment of $100 and subsequently taking up the mortgage notes for the balance of the purchase price. He also paid the $130 note with which the other two lots were bought. He furnished practically all the money with which the house was built, and paid nearly all the taxes. The place was used as a home for the family, his father and mother, himself, his brother Holly, and two sisters. The law favors such family arrangements, Rickes v. Rickes, supra, 81 Ind. App. l. c. 541, 141 N. E. l. c. 489(3).

All this was done with the knowledge and acquiescence of appellant's present co-tenants. Why would he have done it if he expected six-sevenths of the title to go to brothers and sisters who had contributed almost nothing—relatively—some of whom were directly benefited by living in the home and some of whom resided in another state. Doubtless appellant had no conception of the legal distinction between paying or obligating himself for the whole purchase prices when the title to the lots was acquired, and taking up later the notes and deferred payments signed by the father and mother. His case failed on that issue because his proof was not sufficiently clear and convincing to measure up to the standard set by the law. But if the question whether

he thought he was the owner of the lots had been submitted under the weight of evidence rule, we think he would have prevailed.

So the question before us now is whether one who honestly believes he is (but in fact is not) the owner of the whole *equitable* title to land and pays the taxes in that belief, can claim credit for them in a partition suit brought after he has later become a tenant in common. In Byrne v. Byrne, 289 Mo. 109, 124(v), 233 S. W. 461, 465, a partition suit, the fractional interests of the heirs in the land were undisputed and the sole issue was on an accounting of improvements, taxes, rents, profits and waste. The plaintiff had been discriminated against in the will of her grandfather, which devised most of his real estate to designated children in severalty. Seventeen years after the will was probated (she being a minor during the intervening time) the plaintiff granddaughter brought a suit to contest it. The suit was tried and appealed three times and each time the will was set aside. All this took ten years. Immediately following the termination of that litigation the successful plaintiff, having thereby established herself as a tenant in common of all the land, brought the partition suit twenty-seven years after the will had been probated. The improvements and taxes involved had been made and paid over that period by the prima facie owners in severalty of the various tracts under the will, though their titles were in litigation much of the time, but after those titles were held void in the will contest case and the status of the heirs as tenants in common established, they were allowed an accounting on them in the subsequent partition suit.

In Flatt v. Flatt, 189 Ky. 801, 225 S. W. 1067, certain farm land was owned by J who had executed a will devising equal undivided interests therein to his children subject to his widow's life estate. Before his death two of the children sold and conveyed their said *expectant* undivided interests to W, who later acquired another *valid* undivided interest from another source. Upon the death of W these interests were sold in probate to F. After the death of the testator and his widow, the aforesaid two children brought a partition suit against F and the other co-tenants claiming their undivided interests as devisees under J's will and repudiating as void their prior conveyances of the same expectant interests to W. Held: the latter conveyances were void; but the two children must account in the partition suit for the consideration received by them from the sale of those interests and for improvements placed on the land by W and F in reliance upon said conveyances.

In Guignard v. Corley, 147 S. C. 12, 144 S. E. 586, 590(3), 62 A. L. R. 533, a partition suit, the plaintiff G had built spur tracks from his brickyard across intervening land to a railroad under an indefinite oral contract with C, who held a fee in part of the land defeasible on B's death with a limitation over to B's sisters. As to another segment of the land G had no color of title at all and was a

mere trespasser, though he assumed this segment was included with the land to which C held the aforesaid defeasible fee. After B's death the fact was discovered that a small fractional interest in his land was outstanding, and G purchased it thus becoming a tenant in common. The opinion held G "logically" should be denied all credit for the spur tracks since he had constructed them when he held no title to the land. But, treating the case as peculiarly calling for the exercise of chancery powers, the court ordered that the particular strips occupied by the spur tracks be alloted to G and that he be required to pay the other co-tenants their pro rata part of the value of said tracks—or we so understand the opinion.

Finally in Walker v. Eller, supra, 178 Ark. 183, 189, 10 S. W. (2d) 14, 17 (8) the heirs of H brought a suit after his death for the partition of his land and an accounting of rents and profits. The defendant-appellants answered claiming sole ownership under a parol contract with the deceased whereby he agreed to deed or will the land to them in consideration of care, support, payment of taxes and repairs. The appellants were the husband and children of a niece of H who pre-deceased him. He left a will devising the land to her and not to them, but because of her death the devise lapsed. The opinion held appellants had not established the parol contract by clear, decisive and convincing testimony as required by law, and therefore were not entitled to a decree; but that they probably would have succeeded if the greater weight of the evidence had been sufficient; and that it would be inequitable to deny them credit in the partition for improvements and taxes made and paid under the belief that the land would be theirs at the testator's death.

We think the Walker case last cited accords with the equities in the present suit and states the rule that we should follow. This conclusion is not in harmony with the intimation in Carver v. Coffman, 109 Ind. 547, 549, 10 N. E. 567, 569 and Cole v. Johnson, 53 Miss. 94, 102, that color of title is necessary to entitle a bona fide claimant to an accounting in partition for improvements made or taxes paid. But we can see no reason why such relief should be restricted to the holder of a supposed paper title or color of title. If, as all the cases say, the rule is founded on equitable considerations why should it not extend to equitable titles? The appellant in this case was no trespasser. He had provided a home for his father, mother, two sisters and respondent's deceased husband. He did not ask an accounting for improvements in this case but did for taxes he had paid, which preserved the land for all the other heirs. We hold an accounting should be made of all taxes on the lots shown by this record to have been paid by appellant both before and after the mother's death in 1935.

The cause should be reversed and remanded for another reason. The decree finds the interest of each living child to be 12/84 or one-seventh, and the interest of each of the grandchildren 3/98. But

each of the six living children had a one-seventh interest from the beginning, as soon as the mother died, and each of the seven grandchildren had 1/49. When the son Holly thereafter died intestate in 1937 without issue or living parent, and the respondent, his widow, elected to take one-half of his one-seventh interest, the other 1/14 descended under Sec. 306, R. S. 1939, Sec. 306, Mo. Stat. Ann., p. 194, in six equal shares, one each to his five surviving brothers and sisters and another to the seven grandchildren, they being children of his brother James who predeceased the mother. This made the interest of each child 13/84 or 91/588, and the interest of each grandchild 13/588. The cause is reversed and remanded for further proceedings in partition not in conflict herewith.

All concur.