260 S.W.2d 548 (1953)
ARONSON
v.
SPITCAUFSKY et al. (SIEGFRIED et al.).
No. 43429.
Supreme Court of Missouri, Division No. 2.
September 14, 1953.
Raymond G. Barnett, John H. Foard, Barnett & Foard, Kansas City, for appellants.
Solbert M. Wasserstrom, Kansas City, for respondent.
BOHLING, Commissioner.
On June 1, 1951, Ed Aronson instituted this action to quiet title to three parcels of land hereinafter described by petition in usual form against John B. Spitcaufsky and Mollie Spitcaufsky, his wife, and numerous parties-defendant, holders of mortgage notes, special tax bills and last record owners prior to the tax foreclosure proceedings mentioned infra. Defendants Milton C. Siegfried and Eugenia T. Siegfried, his wife, disclaimed title in favor of defendants Spitcaufsky. The decree was for the plaintiff. The Spitcaufskys, the only parties perfecting an appeal, claim they are entitled to prevail on the theory plaintiff held title under a constructive trust for the use and benefit of Mollie Spitcaufsky.
A few preliminary observations may be helpful. Each parcel of land is situated in the Southeast quarter of the Northwest quarter of Section 27, Township 49, Range 33, Kansas City, Jackson County, Missouri. Parcel 1 is the Northwest quarter, Parcel 2 is the Southeast quarter of the Northeast quarter, 2½ acres, and Parcel 3 is the east 15 acres of the South half of said quarter-quarter section. The Spitcaufskys claim an interest only in Parcels 2 and 3, which was *549 known as "the Sloan and Spitcaufsky land" or "Osage Land Company property." The 5 acres immediately west of Parcel 3 was owned by plaintiff and known as Aronson's Subdivision.
Parcels 1, 2 and 3 (and, we understand, also Aronson's Subdivision) were sold under the "Land Tax Collection Law", Sections 141.210-141.810 RSMo 1949, V.A. M.S., and deeded by the Sheriff of Jackson County, Missouri, to the Land Trustees of the Land Trust of Jackson County, Missouri, on December 30, 1947. Thereafter, plaintiff, by deeds, not questioned here, from said Land Trust acquired title to Aronson's Subdivision in April, 1948; to Parcel 2, the 2½ acres, (also Parcel 1, not here involved) on June 28, 1949, for $4,000; and to Parcel 3, the 15 acres, on February 10, 1950, for $950.
After plaintiff established his title as above outlined, defendants Spitcaufsky adduced evidence on their affirmative claim that plaintiff held title under a constructive trust based upon an oral agreement between Mr. Spitcaufsky and plaintiff that plaintiff purchase Parcels 2 and 3 in his name and thereafter convey an undivided half interest therein to Mollie Spitcaufsky. The Spitcaufskys' case rests upon the testimony of John Spitcaufsky, corroborated in part by Milton C. Siegfried.
To establish an implied trust, whether a resulting or constructive trust, an extraordinary degree of proof is required and vague or shadowy evidence or a preponderance of the evidence is not sufficient. The evidence must be so unquestionable in its character, so clear, cogent and convincing that no reasonable doubt can be entertained as to its truth and the existence of the trust. Norton v. Norton, Mo.Sup., 43 S.W.2d 1024, 1032[6]; Ferguson v. Robinson, 258 Mo. 113, 167 S.W. 447, 453; Purvis v. Hardin, 343 Mo. 652, 122 S.W.2d 936, 938[1-6]; Thomason v. Beery, 361 Mo. 424, 235 S.W.2d 308, 312[5]. A higher degree of proof is necessary to establish a constructive trust than to establish fraud. Tobin v. Wood, Mo.Sup., 159 S.W.2d 287, 290[7].
John Spitcaufsky was born at Kiel, Russia, and came to this country with his parents at the age of eleven. His schooling was limited but the record indicates he was successful as a contractor and has retired. Mr. Spitcaufsky was acquainted with William M. Sloan, Street Commissioner of Kansas City. Upon Mr. Sloan's recommendation and request, he gave Mr. Sloan $5,000 on the purchase of Parcels 2 and 3. The $5,000 was his wife's money, money she received from the sale of an apartment and from allowances he gave her. The deed, dated December 6, 1921, from the Kansas City Life Insurance Company named "John Spitcaufsky and William M. Sloan" as grantees. Mr. Spitcaufsky testified his wife Mollie should have been named in his stead and the mistake was Mr. Sloan's. From his testimony and the recited consideration of $5,000 in the deed, Mrs. Spitcaufsky paid to Mr. Sloan the full purchase price.
"John Spitcaufsky" and "Mollie Spitcaufsky," for one dollar and other valuable considerations, conveyed an undivided one-half interest in Parcels 2 and 3 to the Osage Land Company, a Missouri corporation, on January 19, 1923. This corporation was owned by the Spitcaufskys and Mollie Spitcaufsky was President.
Mr. Spitcaufsky was acquainted with Milton C. Siegfried, who wanted title to some real property that he might qualify as a professional bondsman. Mr. and Mrs. Spitcaufsky, on the recommendation of Mr. Spitcaufsky, caused the Osage Land Company, by warranty deed dated September 1, 1926, to convey an undivided half interest in Parcels 2 and 3 to Milton C. Siegfried. Mr. Siegfried testified that Mr. Spitcaufsky took the deed, stating he would get his wife's signature. The deed is signed "Osage Land Company by M. Spitcaufsky, President." The notary described the acknowledger in the masculine gender. Mr. Siegfried testified he qualified with this land for $20,000.
Mr. Spitcaufsky testified it was the intention of the Spitcaufskys to convey only "half of our half," not the whole of their half, to the Osage Land Company, and that *550 only "half of our half should have gone to Siegfried."
Mr. Spitcaufsky and Mr. Siegfried testified Mr. Siegfried paid nothing for his deed. Mr. Spitcaufsky testified that if Mr. Siegfried made anything out of the bond business, he would share the bonding commissions; that he thought Mr. Siegfried met Mrs. Spitcaufsky at the time; that he was not certain he told Mr. Siegfried he was holding the property for Mrs. Spitcaufsky but thought Mr. Siegfried knew this; that Mr. Siegfried was to re-transfer the property whenever the Spitcaufskys requested; and that he did not know whether Mr. Siegfried executed any bonds and could not remember receiving any commissions from him.
Mr. Siegfried testified a note for $10,000, secured by a deed of trust on the land, was given as security to Mr. Spitcaufsky. Mr. Spitcaufsky, in a deposition, appeared to not know the purpose of this note, but at the trial stated he knew its purpose.
Mr. Siegfried testified he held the legal title to Parcels 2 and 3 in trust for John Spitcaufsky; that Mr. Spitcaufsky never stated he (Siegfried) was holding the title for Mrs. Spitcaufsky and he never had any conversation with her; that he made a few bonds, received commissions, and he divided the commissions with Mr. Spitcaufsky but never with Mrs. Spitcaufsky. He started keeping the books for the Liberty Bonding Company, a partnership composed of Rosie Passantino, Henry Laboi and plaintiff, in 1946, was there practically every day, and informed plaintiff of his ownership of the land in 1946.
The record title to Parcels 2 and 3 was in Mr. Siegfried and Mr. Sloan or his heirs at the time of the foreclosure. The land was vacant land, and there was testimony that the special tax bills against the properties amounted to more than their value.
Mr. Spitcaufsky made inquiry of the officials concerning Parcels 2 and 3 in 1947, and was told if he waited until after the sale he could buy it from the Land Trust and eliminate the special taxes. He did nothing. He was at the Land Trust office after the sale inquiring about getting the property back. They would not give him a price. They asked him to bid, but he did not make a bid, stating he did not know how.
Mr. Spitcaufsky testified "I went to Mr. Aronson," and plaintiff asked him what he was doing about redeeming his property; that he answered he was trying but didn't know how; that plaintiff said he had cleared his property; that he asked plaintiff to help him clear Parcels 2 and 3 and receive a good commission, and plaintiff said he would see what he could do; that later he came back to plaintiff's office and asked Mr. Siegfried (whose assistance he had previously sought but who told him to get some attorney more familiar with the tax collection law) if he thought he could get plaintiff to help and Mr. Siegfried said that was the thing to do; and: "So I talked to Mr. Aronson again at his office. This time, you know, Mr. Siegfried was not there. Some other great big gentleman was there. I don't know his name. I think he is an Italian. Mr. Aronson promised me he would do it; he would take care of it and I just left the matter as it was."
Mr. Spitcaufsky also testified that while he was razing buildings for the Southwest Trafficway he had his first conversation with plaintiff, he thought, he didn't remember, in late 1947 or early 1948. Plaintiff came there and asked what he was doing about his property. He told plaintiff he didn't seem to get anywhere. Plaintiff said he had cleared his property. He asked plaintiff to help him, and plaintiff said he would think about it. He went to plaintiff's office. Mr. Siegfried was there, and told him to have plaintiff help him. He made two or three trips to plaintiff's office but plaintiff was not in. An Italian Mr. Passantino, told him the best time to find plaintiff, and `finally around noontime" he found Mr. Aronson at the office. He could not tell the date, but it was, perhaps a couple of months, before June 28, 1949the date of plaintiff's deed for Parcel 2. It was in the forenoon, would not state the hour, "maybe about 10:00 or 10:30 or 11:00, I couldn't tell you." He asked plaintiff "to buy the property in his name for us." He understood *551 if they bought it, they would be liable for the special taxes. Plaintiff said "he would and turn it back to us." There was no discussion about what plaintiff was to pay for the land, none at all. "There was no thought about money," nothing said about it. In answer to a leading question he said Mr. Siegfried was in another part of the office and the "big fellow, Passantino" left. He did not remember ever mentioning his wife's name and did not tell plaintiff to buy it for her.
Mr. Spitcaufsky testified that there was no other conference after the talk at plaintiff's office; that he tried to talk to plaintiff and plaintiff would not answer him, and also that he occasionally met plaintiff and asked him how he was getting along and plaintiff would answer that he was working on it and it took time.
Mr. Spitcaufsky testified at the trial that plaintiff was to purchase Parcels 2 and 3, keep a half interest and transfer the other half to the Spitcaufskys at a profit or commission; but in his deposition stated that they were to give plaintiff whatever title they had to the other (Sloan's) half "The only thing would be the division of partnership, I suppose. Something like that."
Mr. Siegfried testified that Mr. Spitcaufsky had granted him a favor in letting him hold title to qualify for making bonds and earn some money; that he was in the office when Mr. Spitcaufsky and Mr. Aronson had their conversation and heard enough to know what they were talking about; that he was busy working on the books and taking care of the cash and did not pay "extra attention," but heard Mr. Aronson say: "Well, I will work with you." He could not give the substance of their conversation; and his impression that they were talking about the land was based on the general circumstances and his prior conversations with Mr. Spitcaufsky and with Mr. Aronson. He stated Mr. Aronson voluntarily told him of his purchase, he thinks in 1949, did not keep it a secret, and he then told Mr. Spitcaufsky, who stated he had heard it at a delicatessen store.
Mr. Spitcaufsky first learned plaintiff purchased the land when plaintiff's nephew told him plaintiff had purchased it while he was at the nephew's store. He could not give any date, but it was after plaintiff bought the land. He found plaintiff at the police station and when he asked plaintiff about it, plaintiff did not answer him. Plaintiff's deed for Parcel 2 is dated June 28, 1949, and for Parcel 3 is dated February 10, 1950.
Briefly of Mr. Aronson's testimony. The three partners kept the Liberty Bonding Company open 24 hours a day. Mr. Aronson was on duty from midnight until 8 a.m., and Mr. Passantino from 8 a.m. until 4 p.m. Mr. Aronson testified he very seldom stayed at the office after 8 and always left before 9 a.m. His parents used to live on Southwest Boulevard and when he saw the house being demolished, he stopped and asked Mr. Spitcaufsky about purchasing a metal garage and Mr. Spitcaufsky told him he could. This was all that was mentioned. There was nothing said about any property or his having purchased his five acres from the Land Trust. He knew that Mr. Spitcaufsky and Mr. Sloan had purchased the land, but did not follow its ownership and did not know who owned the Osage Land Company. He never, at any time, had a meeting with Mr. Spitcaufsky at his office. He never made a contract with Mr. Spitcaufsky about Parcels 2 and 3 Mr. Spitcaufsky never asked him to buy the land for him or his wife. His attorney advised he would have to bring suit or buy out the other interests to clear the title to Parcels 1, 2 and 3. He talked to Mr. Siegfried, who said he did not own the land, was a straw, and he made an offer to Mr. Siegfried to give Mr. Spitcaufsky $300 for good will rather than pay a lawyer. His room was in the front and Mr. Siegfried worked in the back room of the office.
Other facts of record need not be developed. The foregoing are sufficient and controlling. The testimony on behalf of the Spitcaufskys is conflicting, vague, uncertain, and does not establish with exactness what plaintiff and John or Mollie Spitcaufsky *552 should do. Whether plaintiff's evidence be satisfactory in all things or not, the Spitcaufskys had the burden to establish the constructive trust and the credibility of their witnesses was for the trial court. The chancellor was justified in finding that the evidence did not measure up to the standard necessary to establish a constructive trust. The decree was for the right party. We need not consider plaintiff's issues to the effect that, taken as established, the terms of the constructive trust are too indefinite and uncertain to be given effect and that the oral contract testified to and its breach cannot give rise to a constructive trust.
The judgment and decree is affirmed.
WESTHUES and BARRETT, CC., concur.
PER CURIAM.
The foregoing opinion by BOHLING, C., is adopted as the opinion of the Court.
All concur.