Walter EARNEY et al., Plaintiffs-Appellants,

v.

David L. CLAY et al., Defendants-Respondents.

No. 9644.

Missouri Court of Appeals, Springfield District.

Nov. 7, 1974.

John L. Woodward, Steelville, Morton K. Lange, Cuba, for plaintiffs-appellants.

Charles T. Smallwood, Northern, Williams & Smallwood, Rolla, G. C. Beckham, Steelville, for defendants-respondents.

TITUS, Judge.

Contrary to the claims of her collateral kinsmen, it was judicially determined that the writing executed by Ethel Clay in July 1960 and admitted to probate October 6, 1966, was her last will and testament. Earney v. Clay, 462 S.W.2d 672 (Mo.1971). After directing payments of debts, funeral expenses and placement of a marker on her designated grave in the Liberty Cemetery near Steelville, Missouri, the will bequeathed and devised "all of the rest and

residue of my property . . . (after same has been reduced to cash as hereinafter provided), in trust, to the . . . County Court of Crawford County, Missouri, to be held in trust . . . in accordance with the provisions of [now 214.150 et seq. RSMo 1969, V.A.M.S.] for the purpose of the perpetual care and maintenance of my grave site, and the grave site of my husband [who predeceased Mrs. Clay], and the grave sites of the Clay family located in the Liberty Cemetery." The will stipulated that the person appointed by the county court to administer the fund [§ 214.170], was "to place flowers on said grave on each Decoration Day, and keep said grave sites in orderly and attractive condition, in so far as the earnings of said trust will permit." Co-executors named in the will were "my husband's nephew, David Lee Clay and Darrell Branson," with the provision that if "either of them should die . . . the survivor is to act as sole Executor." (Darrell Branson died and David Lee Clay acted as sole executor in all things concerned here). The co-executors were directed by the will "to convert all of my property to cash, and . . . are to have power to sell both real and personal property without order of court and are to sell said property to such person, and at such price, as they see proper [and] they are to use their best judgment as to whether [the land] is to be sold in one tract or divided into parcels. They are to pay all of my debts, funeral expenses and administrative expenses and upon final settlement . . . the remaining cash is to be paid over in trust to the County Court . . . as provided in . . . this will."

Subsequent to final decision in the will contest (Earney v. Clay, supra, 462 S.W.2d 672), 19 collateral heirs of testatrix filed the present action February 9, 1971. The cause was tried on plaintiffs' first amended petition which was filed September 14, 1972. Ultimately included as defendants were the executor, the parents of the executor who had purchased Tracts 1, 2 and 3 (85 acres) from the executor, and Larry Branson (son of the deceased co-executor) et uxor who purchased Tract 4 (25 acres) from the executor. A notice of lis pendens had been filed and the purchasers of the four tracts were aware of the pendency of this litigation when they bought the real estate from the executor in February and March 1972.

Pared of its diffusion, the amended petition of plaintiffs sought: (1) to establish a resulting trust to that part of the testamentary trust which plaintiffs asseverated was in excess of the sum necessary to satisfy the terms of the testamentary trust and have the excess paid to plaintiffs as intestate property (§ 474.030 RSMo 1969, V.A.M.S.) under § 474.010(2)(c) RSMo 1969, V.A.M.S.; (2) to set aside the sales of real estate made by the executor on the averred grounds that he, "acting illegally, fraudulently, in collusion with the purchasers, and in excess of the authority granted him under the will, and for the purpose of appropriating an advantage to himself and to the purchasers, in fraud of, and to defeat the rights of the plaintiffs," sold the real estate for "less than one half its true value"; and (3) to establish plaintiffs' rights to reconversion by election. Plaintiffs tendered the sum of $2,000, claiming it was sufficient to insure the proper execution of the testamentary trust. The trial court's findings of facts and conclusions of law [Rule 73.01(b), V.A.M.R.] compelled a judgment adverse to the plaintiffs on all scores and they appealed.

Plaintiffs' points relied on, as penned in their brief are: "I. The Court erred in failing . . . to set aside the sale[s] of . . . real estate by the Executor . . . because: A) The evidence clearly established that the Executor was directly and indirectly interested in the sale, that he failed to exercise the same degree of care and judgment one would use in disposing of his own property, and that he failed to obtain or even attempt to obtain an adequate consideration for the property.

II. The Court erred in failing and refusing to recognize appellants' right to reconversion by election, because: A) The evidence clearly established appellants' right of reconversion. III. The Court erred in ruling that the assets of the . . . Estate, and of the testamentary trust, were not in excess of the amount necessary to carry out the terms of the trust, and in failing and refusing to declare a resulting trust for the excess, because: A) The undisputed evidence was that the grave sites could be maintained for not more than $100.00 per year, and a principal of $2,000.00 would be more than adequate to carry out the terms of the trust, and to provide for the future as well. IV. The Court erred in finding that the four tracts . . . were of the fair and reasonable market value of $14,800.00 in 1966 and determining that the value of this land in 1972 was only $13,800.00 plus 30%, or $17,940.00 because: A) The credible evidence in regard to the value of the real property in 1972 was that evidence submitted by appellants' witnesses, and the credible evidence in regard to appreciation in value of real property between 1966 and 1972 was that evidence submitted by appellants' witnesses. [No citation of authority follows point IV]. V. The Court erred in finding that there were 30 grave sites in the cemetery and more to be added, which were contemplated by the terms of the will, because: A) The language of the will does not include the distant relatives about which respondents testified." [No citation of authority follows point V.]

■ As we have frequently and unfortunately been required to do, we observe initially that the points relied on save and state nothing for appellate review. Rule 84.04(d) condemns abstractions and conclusions, states that the points should be accompanied "with citations of authorities thereunder," and mandatorily requires that each point shall state not only *what* the alleged error was but *why* it was error. Keith v. Tucker, 483 S.W.2d 430, 434[2] (Mo.App.1972). The rule applies to appellate review of court-tried cases. Lane v. Katt, 421 S.W.2d 544, 546[6] (Mo.App. 1967). Point I does not set forth "why" executor's interest in the sales should condemn them, "why" he did not exercise due care or "why" the executor's sales efforts amounted to utter failure in obtaining adequate consideration for the property. Point II is a blatant conclusion or abstraction which does not attempt to define wherein and why plaintiffs had any right to reconversion, and Point III does not undertake to demonstrate why either the claimed $2,000 principal sum or earnings therefrom would satisfy the requirements imposed by the testamentary trust. The absence of any citations of authority to Points IV and V, would justify in us considering them as being abandoned. Adams v. White, 488 S.W.2d 289, 294[12] (Mo.App.1972); J. R. Meade & Company v. Barrett & Company, 453 S.W.2d 632, 636[4] (Mo.App.1970). Furthermore, the abstraction appearing in Point IV that plaintiffs' evidence was the only credible evidence in the case, is no better or different from saying that the court's findings were against the credible evidence. For many years such assignments have been held too general to preserve anything for review. School Services of Missouri, Inc. v. Caton, 419 S.W.2d 954, 956[2] (Mo.App. 1967). A point complaining that plaintiffs' evidence was the only credible evidence adduced, i. e., that the trial court's finding was contrary to the credible evidence, is a tacit admission there was some evidence to support the court's finding [Nutz v. Shepherd, 490 S.W.2d 366, 369[5] (Mo.App. 1973)], and affronts the rule permitting the trial court, when sitting as the fact trier, to believe all, none or part of any witnesses' testimony. Edmonds v. Stratton, 457 S.W.2d 228, 234[12] (Mo.App.1970). Although the points relied on have not been properly saved, we will review them on their merits.

■ Because of the interrelation, Points I and IV will be considered together. The will imposed upon executor the ab-

solute and mandatory obligation of selling all property of the executrix, leaving him only discretion of selling it at such price to such person as he should see proper and whether to sell it in whole or in parts. 33 C.J.S. Executors and Administrators § 274 b., pp. 1292–1293. When the will confers upon the executor the power to sell property, he has the option of acting under the testamentary direction without recourse to the court for license or order, or under the law governing administration. § 473.457, subd. 3 RSMo 1969, V.A.M.S.; Historical Note, 26 V.A.M.S., p. 155; 33 C.J.S. Executors and Administrators § 277, at p. 1299. Plaintiffs do not question executor's authority to sell the land without court order or supervision.

The real estate in question, consisting of four tracts, was inventoried, appraised by various witnesses and sold by the executor at and for the following sums:

| TRACT NO. (ACRES) | INVEN-TORY | PLAINTIFFS' WITNESSES | | | DEFENDANTS' WITNESSES | | | SALE PRICE |
| | | HALL | | LEA | PERKINS | SWYERS | MORRIS | |
| | DEC. 1966 | NOV. 1967 | SEPT. 1972 | SEPT. 1972 | FEB. 1972 | DEC. 1966 | DEC. 1966 | FEB & MAR 1972 |
| 1 (3A.) | $ 1,500 | $ 2,250 | | $ 4,500 | $ 1,500 | $ 1,500 | $ 1,500 | $ 1,800 |
| 2 (75A.) | 3,000 | 3,750 | | 11,000 | 3,000 | 3,000 | 3,000 | 3,600 |
| 3 (7A.) | 200 | 2,975 | | 1,400 | 200 | 300 | 200 | 240 |
| 4 (25A.) | 10,000 | 14,750 | | 10,950 | 7,500 | 10,000 | 10,000 | 7,500 |
| TOTAL | $14,700 | $23,725 | $33,725 | $27,850 | $12,200 | $14,800 | $14,700 | $13,140 |

As already stated, Tracts 1, 2 and 3 (85 acres) were sold to executor's parents for a total of $5,640; Tract 4 (25 acres) was sold to the son of the deceased co-executor for $7,500.

■ When the will contest case was instituted is not disclosed in the record before us. Nevertheless, the executor's authority to sell the property under the will was or should have been suspended during the pendency of the contest (3 Missouri Practice—Probate Law and Practice— Maus, § 276, p. 240), and he cannot be faulted for not selling until after the contest had been determined. The executor did not advertise the property for sale except "by word of mouth." He did not discuss the sale with plaintiffs herein (and we know of no duty on his part to do so) or list the property with any real estate agency. Executor did, however, counsel with the estate's attorney and scrivener of the will, and recalled the names of three people other than the purchasers with whom he talked about selling the land, explaining: "I wouldn't say that those are the only ones I talked to. Those are the only ones who come to my mind right now." The executor recounted that he received no offers from anyone on any tract after the vandalism except those who bought and did not seek independent appraisals of the property values subsequent to those reported in the inventory. There was ample evidence that after Tract 4 was appraised at $10,000 in December 1966, the house thereon had been extensively damaged by vandals before it was sold in March 1972 for $7,500.

The initial deficiency in plaintiffs' Point I is that there is no rule or law condemning an executor merely because he was "directly and indirectly *interested* in the sale." (Our emphasis). Through interpolation of

that portion of the point in plaintiffs' favor, we suspect they are contending the executor, directly or indirectly, became the purchaser of the property he sold pursuant to directions of the will. From § 165 RS 1889, through § 463.300 RSMo 1949, the law provided: ". . . nor shall the executor . . . at public or private sale, directly or indirectly, become the purchaser of such real estate; and all sales not made in accordance with the provisions of this section shall be null and void." Laws 1955, p. 385, § 174 (now 473.477 RSMo 1969, V.A.M.S.) changed the statute to read: "No executor . . . shall purchase any property belonging to the estate . . . unless written consent thereto is filed by the distributees."

Co-executors named in the will were "my husband's nephew, David Lee Clay and Darrell Branson." Use of "nephew" in the singular would indicate that only Clay was a nephew. What, if any, relationship existed between the surviving executor and the son of the deceased executor who purchased Tract 4, is not revealed. No evidence was offered which held the slightest soupçon that by selling Tract 4 to the son of the deceased co-executor the executor, either directly or indirectly, became the purchaser of that property.

In order to bring the executor's sale of Tracts 1, 2 and 3 to his parents within the condemnation of any of the foregoing statutes, it was necessary that plaintiffs allege and prove that executor, directly or indirectly, bought at his own sale. There is no claim or showing of a direct buy or that executor's parents in buying the three tracts were acting as agents or straws under a resorted-to pretense to place title to that property in the executor. The facts here are unlike those reported in Wortham v. Marten, 354 Mo. 1, 188 S.W.2d 11 (1945); Gilmore v. Thomas, 252 Mo. 147, 158 S.W. 577 (1913); and Barnard v. Keathley, 230 Mo. 209, 130 S. W. 306 (1910). Neither did the evidence suggest that executor, by selling to his par-

ents, would become vested with any beneficial or legal interest in the property as where an executor or guardian sells property at his own sale to his spouse. Bopst v. Williams, 287 Mo. 317, 229 S.W. 796 (1921).

If an executor once sells the property in the prescribed manner, the statutes prohibiting him from purchasing at his own sale do not forever preclude him from later making a good faith purchase of the same real estate. "The 'mere circumstance of the subsequent sale by the purchaser' to the [executor] 'is not sufficient to warrant the assertion that' the sale [by the executor] was not made in good faith. No presumption of collusion arises from that fact alone." Mumbach v. Nienhaus, 219 S.W. 354–355 (Mo.1920). A fortiori, if the executor's sale to his parents was not a feigned transaction to place title in the executor, plaintiffs' suggested possibility that executor might sometime in future inherit the property would not, in and of itself, bring the sale within the prohibitions of the law.

The concluding phrase of Point I, that executor "failed to obtain or even attempt to obtain an adequate consideration for the property," is necessarily akin to Point IV complaining of the trial court's finding as to the reasonable market value of the real estate, because if the court was not clearly erroneous as to the values, it would seem to follow that sufficient consideration had been obtained from the transaction to bar setting aside the sales on that ground. Even a negligible conversancy with litigation respecting real estate values, incites a suspicion that experts on the subject, more often than not, are so divergent in their conclusions they may not be opining on one and the same parcel. As attested by the above chart-summary of the testimony on values, there were, indeed, differences of opinion as to the worth of the four tracts. Albeit plaintiffs would have us rule defendants' witnesses were not competent or qualified, the

transcript discloses that at trial plaintiffs voiced no objections to the qualifications or competency of defendants' experts Perkins and Morris. "If there has been no objection in the trial court to the competency . . . or to the qualification . . . of a witness, none may be interposed on appeal." Hildreth v. Key, 341 S.W.2d 601, 613 [22] (Mo.App.1960); State v. Hastings, 477 S.W.2d 108, 111 [4] (Mo. 1972). No certain formula exists for judging the competency of a witness to give an opinion on real estate values, and qualification of a witness is primarily a question for determination by the trial judge whose discretion will not be overruled unless clearly abused. State ex rel. State Highway Commission v. Heim, 483 S.W.2d 410, 413–414 ,[7, 8] (Mo.App.1972). While plaintiffs' witnesses testified to higher values than those produced by defendants, such disparity is not alone sound reason why the findings of fact trier should be disturbed by an appellate court. State ex rel. Kansas City Power & Light Company v. Campbell, 433 S.W.2d 606, 622 [21] (Mo.App.1968). Conflicts in evidence as to real estate values are for the trier of the facts to resolve [State ex rel. State Highway Commission v. Dockery, 340 S.W.2d 689, 695 [7] (Mo.1960)], and as he heard and saw the witnesses testify as to the values both on direct and cross-examination, he was familiar with their qualifications and of the weight to be given to their · testimony. City of St. Louis v. Gruss, 263 S.W.2d 387, 394 [7] (Mo.1954). We cannot say the trial court abused its discretion or that its findings as to land values were wrong or clearly erroneous.

■■■ The penultimate section of Point I that executor, in selling the real estate "failed to exercise the same degree of care and judgment one would use in disposing of his own property," is not acceptable in view of the contrary findings by the trial court. While the broad authority extended by testatrix to executor to sell the property to such person at such price as he saw proper would not alter the position of trust occupied by executor to those interested in the estate [Rawlings v. Rawlings, 332 Mo. 503, 509, 58 S.W.2d 735, 737–738 (1933)] or lessen his duty to employ the degree of diligence that would characterize the conduct of a reasonably prudent person in the management of his own affairs [Kahmann v. Buck, 446 S.W.2d 457, 460–461 (Mo.App.1969); Young v. Ray, 193 S.W. 608 [1] (Mo.App.1917)], we cannot say, as a matter of law, that the trial court, in fine, clearly erred in finding that executor had not fallen short in performing that duty. Executor advertised the land for sale "by word of mouth." He discussed selling it with persons other than the ultimate purchasers, but received no offers save those made by the buyers. Executor was aware of the vandalism to which Tract 4 had been subjected. He sought counsel on the subject and knew the values placed on the properties by the court-appointed appraisers. § 473.233, subd. 2 RSMo 1969, V.A.M.S. Many reasonably prudent persons sell lands without publicly advertising them in newspapers, etc., or by offering them for sale through real estate agencies. It is not amiss that such a person would sell to only those who offer to buy "without trying to obtain other bids, when satisfied that the offer made represents full [or near full] value. Some think that to place land on the market conveys the impression that it must be sold, and thereby tends to depreciate its selling value. So that the advantages and disadvantages of one method over another are largely a matter of individual judgment, in the exercise of which reasonably prudent persons differ. We do not feel justified in saying that the [executor] was negligent because [he] did not pursue the method the objectors think might have produced better results." In re Branch's Estate, 123 Mo. App. 573, 579, 100 S.W. 516, 518 (1907). Inadequacy of price alone is not ordinarily sufficient to set aside a sale, although it is a factor to be weighed in connection with other evidence as to fraud. Barnard v. Keathley, supra, 230 Mo. at 233–234, 130 S.W. at 313 [16]. But when, as here, the

trial court's findings of land values disclose that the sales prices of the properties were not wholly inadequate, or that the sales were not the result of any fraudulent schemes or combinations designed to place the land titles in executor contrary to law or in fraud of the rights of others, both sides of the scales become empty and there is nothing to weigh.

■ As to plaintiffs' Point II, and predicated on the doctrine that equity deems that done which ought to be done, we have first the rule that when a testator, in a valid testamentary fashion, unmistakably directs that his real estate be sold, there is an equitable or constructive conversion of the real estate into money. Hull v. McCracken, 53 S.W.2d 405–406 [2] (Mo.App.1932). The second rule to consider is that the equitable conversion of the real estate into money continues until such time as there is an actual conversion or until, by election of all the beneficiaries, there has been a reconversion, which reconversion may take place at any time prior to the actual conversion. Griffith v. Witten, 252 Mo. 627, 646, 161 S.W. 708, 714 [9] (1913). However, the election to accept the land in its original state and thus reconvert it, must be unanimous on the part of all the beneficiaries or devisees [Holmes v. Scott, 231 Mo.App. 690, 692, 105 S.W.2d 966, 967 [4] (1937); Kaufmann v. Kaufmann, 226 Mo.App. 172, 177, 43 S.W.2d 879, 881 [4] (1931)], except in those instances where the election of less than all could not possibly injure those not joining in the election. Gilbreath v. Cosgrove, 193 Mo.App. 419, 422, 185 S.W. 1181, 1182 [2] (1916). In the instant case, testatrix gave the executor no discretion with respect to selling the land. Under the will, after payment of debts, funeral charges and administrative expenses, there was but one beneficiary entitled to the converted property and that was the county court. There was no devise of land or any interest in land given to the beneficiary. It was given money; the real estate was merely provided as the source from which the money was to be obtained. Whether the county court had a right of election vel non to reconvert the property is not involved. But since, under the doctrine of reconversion, only those having exclusive beneficial interest in property constructively converted may elect to take it in its actual condition [Wyatt v. Stillman Institute, 303 Mo. 94, 105, 260 S.W. 73, 76 [6] (1924); 18 C.J.S. Conversion § 55, pp. 82–83], and as the plaintiffs do not qualify for that category, they possessed no right of reconversion and the trial court did not err in refusing their claim.

■ Finally we come to Points III and IV, commencing with the principle that unless the transferor manifests an intention that no resulting trust of the surplus should arise, where an express private trust is gratuitously created by will and the property bequeathed or devised to create it proves to be larger in amount than is necessary to accomplish the purpose of the trust, the surplus is to be held upon a resulting trust for the estate of the settlor (Restatement, Second, Trusts § 430; Bogert, Trusts, 2d ed., § 469; Scott, Trusts § 430; Bogert, Law of Trusts § 76 4th ed. Hornbook Series), and if the sum constituting the resulting trust be not validly disposed of by will, it should be distributed as provided for partial intestacy. § 474.030 RSMo 1969, V.A.M.S. Absent a statute making it so, a bequest for the perpetual care and maintenance of individual grave sites or burial lots is not a bequest for charitable purposes (Earney v. Clay, supra, 462 S.W.2d at 673) and the cy pres power or doctrine is not applicable. Restatement, Second, Trusts § 432; Bogert, Law of Trusts § 147 (4th ed. Hornbook Series).

After the costs of administration are paid, etc., it is estimated that the net value of the estate, which will go to the county court in trust, will approximate $10,000. Of course, there has been no experience on which to judge what it will cost now or in the future to decorate and maintain the grave sites in the fashion directed by the will. The only evidence adduced relating to past maintenance costs of Liberty Cemetery, illustrated that money expended by

the cemetery association varied annually from a low of $81 to a high of $719. Such information cannot be accurately employed to calculate the per grave site cost of maintenance because, although there are presently perhaps 250 to 300 grave sites in Liberty Cemetery, the size of the cemetery is not known, the sums expended by the association in the past were necessarily attuned to the amount of money on hand (which varies from year to year), much of the maintenance work (which was valued at near $1,000 annually) is provided by volunteer "interested persons" who gather twice a year to "clean up" the cemetery, and no facts were presented to compare the quality of maintenance performed by the association and that desired by testatrix. Moreover, it was shown that the donated work "gets less and less each year." To compound the problem of calculation, the number of grave sites to be decorated and maintained from earnings of the trust fund cannot be figured from the evidence. Plaintiffs (Point III) base all their calculations on selected assumptions and their assertion "that there were only seven members of the immediate Clay family besides [testatrix] buried in the cemetery", and their disagreement (Point V) with the trial court's finding that there "are seven Clays buried in one area and others scattered over the cemetery with some 150 feet from one Clay grave to another. There are perhaps 30 Clays buried in the cemetery, and some 22 persons related to the Clays buried there. Some of the Clay family still lives and Charles Clay own [sic] 11 grave sites in the cemetery and he expects to be buried there." The word "family" may be so broad or narrow as the intention of the party using the word makes it appear [Lister v. Lister, 73 Mo.App. 99, 104 (1898)], and the judicial construction of "family" must relate to and be consistent with the context in which the word is found. Planning & Zoning Com'n v. Synanon Foundation, Inc., 153 Conn. 305, 216 A.2d 442, 444 [3] (1966). In a more general sense, especially when referring to deceased persons rather than to living persons, it would not seem strained to include in "family" any group of persons closely related by blood as parents, children, uncles, aunts, cousins and any descendants from a common progenitor. Yerkes v. Stetson, 211 Pa. 556, 61 A. 113, 114 (1905); Webster's New World Dictionary of the American Language, College ed., p. 525.

The county court, per § 214.180 RSMo 1969, V.A.M.S., is limited to investing in or loaning said trust fund to only U.S., state, county or municipal bonds or first real estate mortgages or deeds of trust. Plaintiffs' evidence was to the effect that interest rates on these investments since 1941 varied from less than 4% to 8%. No witness could predict, considering inflation and other economic fluctuating factors, what the cost of maintaining cemeteries or what the interest rates would be in the future. Totally ignored by the parties were the provisions of § 214.170 RSMo 1969, V.A.M.S., that the county "court shall retain five percent of the incomes from all trusts and gifts to create a fund to reimburse any trust or gift which has a loss. The court shall have authority to increase or decrease the said five percent as may be necessary to keep all trusts and gifts intact." Whether the County Court of Crawford County had other trusts or gifts to administer, whether such gifts or trusts were intact or not, and how much was or would be necessary to keep them so, is something concerning which neither the trial court nor this court has been advised.

This case cannot be compared to Clark v. Portland Burying Ground Association, 151 Conn. 527, 200 A.2d 468 (1964), where the parties agreed to the amount of the principal needed to keep the burial lot in good condition, or to Security Trust Co. v. Willett, 33 Del.Ch. 544, 97 A. 2d 112 (1953), where 28 years of experience demonstrated that $10 per year was sufficient to defray the cost of upkeep on a grave, or In re Dreisbach's Estate, 384 Pa. 535, 121 A.2d 74 (1956), which involved a trust fund of $169,076.66 and $600 a year was sufficient to maintain the grave sites. The burden of proof is on the party

seeking to establish a resulting trust (Sutorius v. Mayor, 350 Mo. 1235, 1245, 170 S. W.2d 387, 392 [8] (1943), motion for rehearing denied, 350 Mo. 1235, 171 S.W.2d 69 (1943); 89 C.J.S. Trusts § 132 a., p. 995) and an extraordinary degree of proof is required. Vague or shadowy evidence or even a preponderance of evidence is insufficient. The evidence must be so cogent, convincing, clear and so unquestionable in its character that no reasonable doubt can be entertained as to the existence of the trust. Ellis v. Williams, 312 S.W.2d 97, 102 [8] (Mo.1958); Pizzo v. Pizzo, 365 Mo. 1224, 1235–1236, 295 S.W. 2d 377, 385–386 [10] (banc 1956); Aronson v. Spitcaufsky, 260 S.W.2d 548, 549 [1] (Mo.1953). When all of the above mentioned unknown factors are considered and it is recognized that realistic figures as to the cost of decorating and maintaining the grave sites of testatrix, her husband and members of the Clay family cannot be calculated without resorting to guesswork, conjecture and speculation, who can deny that plaintiffs, on whom the burden of proof rested, failed to display such clear, cogent, unquestionable and convincing evidence that no reasonable doubt existed as to the propriety of declaring a resulting trust in this case? The trial court correctly found "the evidence does not conclusively show that there will be more than enough income from the investment of the trust than necessary for carrying out the terms of the trust, nor does it show conclusively that there is but sufficient income to carry out the terms of the trust." Should further reason be given, be it remembered that in her will testatrix requested that the person appointed by the county court to administer the trust fund should "place flowers on said grave on each Decoration Day, and keep said grave sites in orderly and attractive condition, *in so far as the earnings of said trust will permit.*" (Our emphasis). Testatrix "had a perfect right to direct that the residue of her estate be kept in trust for the care [of the designated grave sites], and that all of the [earnings] be spent for these purposes." Ham-

mond v. Stringer, 222 Ark. 189, 258 S.W. 2d 46, 48 (1953).

The judgment nisi is affirmed.

HOGAN, C. J., and STONE, BILLINGS and FLANIGAN, JJ., concur.