**Jack W. MERIDETH et al.,**
**Appellants-Plaintiffs,**

v.

**Charles E. MERIDETH et al.,**
**Respondents-Defendants.**

**No. KCD 27993.**

Missouri Court of Appeals,
Kansas City District.

April 4, 1977.

William Brandecker, Ronald E. Smull, Brandecker & Smull, Columbia, for appellants-plaintiffs.

Larry M. Woods, Sapp, Woods & Orr, Columbia, for respondents-defendants.

Before WASSERSTROM, P. J., and SOMERVILLE and TURNAGE, JJ.

TURNAGE, Judge.

Jack, James, Billy and Joe Merideth brought suit against their brothers, George and Charles Merideth, and Charles' wife, Jean, to impress a resulting trust on the farm belonging to their father. The trial court found the plaintiffs' evidence was not sufficient to establish a trust, and entered judgment for the defendants.

On this appeal Jack and his brothers contend their evidence was sufficient to call for a resulting trust to be impressed upon the land. Affirmed.

Eugene Merideth was the father of six sons and four daughters. He and his wife lived on a farm of about 120 acres near Columbia, Missouri. The farm, until after the death of Eugene's wife, was owned by Eugene's brother. Up to that time Eugene and his wife had never been able to raise enough money to buy the farm, but through an understanding with the brother they were allowed to live there.

Eugene's wife, the mother of all of the parties here except Jean, died in 1952. Jack, James, Billy and Joe lived in California. All of them except James came to Columbia for their mother's funeral. George and Charles lived in Columbia.

The testimony on behalf of Jack and his brothers from California indicated a meeting was held after their mother's funeral. In the brief of Jack and the other plaintiffs, the statement is made that all parties agree the purpose of this meeting was to make their 73 year old father secure to live out his life on the home place. The details of the meeting were somewhat disputed though some facts were agreed upon. All parties agreed the farm could be purchased from Eugene's brother for the sum of $5,000. Charles had already obtained a commitment for a bank loan in Columbia

for $3,000, which left $2,000 to be raised. It is further agreed in the testimony that the $2,000 balance could have been borrowed in Columbia. The difference in the testimony arises concerning the conversation and the parties present at the time the matter of raising the $2,000 balance was discussed.

According to the plaintiffs' version, the meeting took place at George's house in Columbia, with Eugene, the father, and Jack, Billy and Joe from California, and George and Charles present. Jack testified the father stated at the meeting the purchase of the farm would provide him a home and the investment of Jack and his California brothers would always be safe. Jack further stated his father was sitting on a couch with tears streaming down his cheeks, flanked by George and Charles, when the conversation took place. Jack further stated George told him his investment would never be worth any less and it would provide a home for their father and the boys' investment would always be safe. The discussion seems to have indicated the father would continue to live on the farm and George and Charles would continue to do the actual farming. There was no discussion as to how title would be taken to the farm. Joe testified he was not involved in the conversation as such, but did overhear it. He stated the conversation was that the four California sons were to invest in the farm and it would not depreciate and their investment would always be safe. He also understood his father would take title, but he stated there was no discussion as to whether or not the father would notify anyone in the event he transferred title.

Billy testified his father stated if the California boys could raise $500 each, the father could raise the other $3,000. He stated his father said it would be an investment for the boys in California and it would always be safe. He stated George added it would never depreciate and was a good buy. He testified the conversation indicated their father would have the use of the farm and George and Charles would take care of the $3,000 loan, pay the taxes and operate the farm. He further stated no percentage was

mentioned concerning the ownership of the California boys, but it just worked out mathematically that $500 was ten percent of the $5,000 purchase price.

The father died in 1967. Between 1952 and 1967 the California sons returned to Columbia on an almost yearly basis. At least it appears one or more of the sons living in California would be in Columbia every year. During this time there was no change in the appearance of the farm. Neither was there any discussion whatever between any of the parties as to the ownership of the farm or the status of the loan or the profit, if any, arising from the operation of the farm. After the father's death, the California sons returned for his funeral and still no discussion occurred concerning the ownership or disposition of the farm. It was not until 1971 that Jack decided he would try to get some information about the farm. He stated George and Charles were evasive in response to his questions concerning the existence of a will by their father and as to the status of the farm. At a meeting in November, 1971, between Jack, Billy, Joe and George, Jack raised a question about the farm. There is a dispute in the evidence as to what was said, but apparently some comment was made regarding the interest of the California sons in the farm.

In June, 1972, Jack received a tip from one of his sisters that the father had deeded the farm to George and Charles. Jack called the Recorder's Office in Columbia and verified that in 1961 the father had deeded the farm to George and Charles with the reservation of a life estate in himself. Later Charles had deeded his one-half interest to himself and his wife to create a tenancy by the entirety.

George and Charles testified. George denied their father was at any meeting when the question of raising the additional $2,000 was discussed. Charles denied he ever attended any such meeting.

■■ The burden of proof to establish a resulting trust is on the party seeking to establish it. *Earney v. Clay,* 516 S.W.2d 59, 68[23–25] (Mo.App.1974). The proof re-

quired to establish such a trust must be "so clear and convincing 'as to exclude all doubt from the mind of the court.'" *Ellis v. Williams,* 312 S.W.2d 97, 102[8] (Mo.1958). In that case the court further stated, quoting from *Aronson v. Spitcaufsky,* 260 S.W.2d 548, 549 (Mo.1953):

> " 'To establish an implied trust, whether a resulting or constructive trust, an extraordinary degree of proof is required and vague or shadowy evidence or a preponderance of the evidence is not sufficient. The evidence must be so unquestionable in its character, so clear, cogent and convincing that no reasonable doubt can be entertained as to its truth and the existence of the trust.'"

In addition to the burden and degree of proof necessary to establish a resulting trust it is also the rule that such trust is implied by law from the circumstances and facts as they existed at the time of the transaction and from the conduct and acts of the parties. *Fulton v. Fulton,* 528 S.W.2d 146, 153[5–12] (Mo.App.1975).

In *Adams v. Adams,* 348 Mo. 1041, 156 S.W.2d 610, 614[6, 7] (1941) the court stated the following elements must be shown by evidence of high probative value by the party seeking to establish the trust:

(1) The showing must be consistent with an intent to create a trust for his own benefit.

(2) The presumed or supposed intent must have existed at the time the [alleged trustee] acquired title.

(3) The money advanced by [the cestui] at the time and subsequently must have been paid with that purpose, and not as a loan or gift to the parents.

(4) If money were loaned no resulting trust can arise even though it was understood the [trustee's] title should be held for the benefit of [the cestui] as security for the money advanced by him, or even on an agreement to share in the [benefits].

An examination of the evidence adduced by Jack and his fellow plaintiffs shows the main concern at the meeting was to obtain the ownership of the farm for the benefit of the father so he could live out his life on the home place.

The evidence relied upon to show any ownership on the part of the California sons is restricted to statements attributed to their father that they would have an "investment" or "interest" in the farm. The precise percentage interest was deduced by these sons from the fact the amount they agreed to contribute would constitute ten percent of the total purchase price. From this, the California sons contend they are each entitled to a ten percent ownership, or an aggregate of forty percent ownership in the farm.

However, a careful review of the record leads this court to conclude the trial court was correct in holding the plaintiffs' evidence did not establish a resulting trust. The facts adduced by the plaintiffs about the meeting, taken with the facts and circumstances surrounding that meeting, leads this court to conclude the intent of the contribution made by the California sons was to secure the home place for their father. While it may not be possible to precisely state the California sons made a gift or a loan, the evidence nonetheless leaves too many doubts in the mind of this court to hold the purpose of the contribution was to obtain a beneficial ownership in the farm. The terms used by the father, interest or investment, could equally apply to a loan or to any number of other possibilities. When it is considered the facts necessary to create a resulting trust must have existed at the time the title passed to the father, it is impossible to say without doubt the California sons intended to gain an actual ownership interest in the farm as contrasted with making a gift or loan.

Basically the plaintiffs were required to prove the money they paid was given for the sole purpose of establishing a trust for their benefit. The evidence on that is too vague and equivocal to meet the burden the law imposes on the plaintiffs.

The plaintiffs advance the argument that money advanced from a child to a parent

for the purchase price of land is not presumed to be a gift. This was held in Adams, *supra.* The plaintiffs conclude from this that a resulting trust must be presumed in this case. This argument was answered in *Adams* in the following language at 156 S.W.2d 614[3, 5]:

"It is true that when one person furnishes the purchase price of land and another takes the title, the law implies a resulting trust in favor of the former. As the term signifies, the trust results from those facts; and in that sense it may be said the law presumes or supposes an intent to create a trust after the basic facts are proven. 65 C.J. § 155, p. 380. But until then no such presumption arises, for the law also requires contracts for the sale of real estate and conveyances of title to be in writing, and prima facie presumes the holder of the title to be the owner. . .
And so, because of the instability of parol evidence and for the [purpose] of titles, almost universally the cestui que trust is required to show by clear, cogent and convincing evidence the underlying facts necessary to raise the presumption."

In this case plaintiffs failed to prove the underlying facts by the degree of proof required to raise a presumption of a resulting trust. The facts shown by plaintiffs indicate the money may have been either a gift to their father or a loan. In that circumstance no presumption can arise because the underlying facts which would give rise to a presumption have not been proven.

The plaintiffs further argue the deception which they claim George and Charles practiced in failing to reveal the fact the father had deeded the farm to themselves proves a trust. However, this occurred long after the money was given to the father and the facts necessary to establish the trust must exist at the time the title passed to the father. Thus any deception practiced by George and Charles would have no bearing on proving facts necessary to create a resulting trust.

The finding of the trial court that the evidence of plaintiffs "to establish a trust was not so clear, cogent and convincing as to exclude any reasonable doubt thereof" was correct. The judgment is affirmed.

All concur.